## BARNES *v.* CHICAGO, MILWAUKEE AND ST. PAUL RAILWAY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF WISCONSIN.

Argued March 22, 23, 24, 1887. — Decided May 23, 1887.

If a decree in equity be broader than is required by the pleadings, it will be so construed as to make its effect only such as is needed for the purpose of the case made by the pleadings, and of the issues which the decree decides.

The decree entered in accordance with the opinion of this court in *James* v. *Railroad Co.*, 6 Wall. 752, when properly construed, invalidated the foreclosure of the mortgage made by the La Crosse and Milwaukee Railroad Company to the plaintiff in error only as to the creditors of the company subsequent to the mortgage who assailed it in that suit, but did not affect it as to the rights of the plaintiff in error or of the bondholders secured by the mortgage, which were acquired under that foreclosure.

The consent of bondholders required by the statute of Wisconsin to enable the plaintiff in error to commence proceedings for the foreclosure of the mortgage of the La Crosse and Milwaukee Railroad was duly given; and the outstanding bonds which were not actually surrendered and exchanged for stock were held by persons who, in law, must be regarded as consenting by silence to the proceedings, and the present holders took them with full notice of that fact.

The plaintiff in error has no title under which he can maintain a bill in

equity to take advantage of alleged frauds or irregularities in the foreclosure of prior liens upon the La Crosse and Milwaukee Railroad; or to recover money paid by the Milwaukee and Minnesota Railroad Company to redeem the Bronson and Soutter mortgage of that railroad.

In equity. Decree dismissing the bill. Complainant appealed. The case is stated in the opinion of the court.

*Mr. Francis Fellowes* and *Mr. William Barnes* in person for appellant.

*Mr. John W. Cary* for appellee.

Mr. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a suit by William Barnes to foreclose a mortgage made to him, as trustee, by the La Crosse and Milwaukee Railroad Company, hereinafter designated as the La Crosse Company. The record shows that this company was incorporated by the legislature of Wisconsin on the 11th of April, 1852, to build and operate a railroad in that State between La Crosse, on the Mississippi River, and Milwaukee, on Lake Michigan, a distance of about two hundred miles. The road was originally regarded by the company and treated as consisting of two divisions — one, called the Eastern Division, extending from Milwaukee to Portage City, a distance of 95 miles; and the other, called the Western Division, extending from La Crosse to Portage City, a distance of 105 miles.

The Eastern Division was incumbered by three mortgages, as follows: 1, the Palmer mortgage, so called, to secure an issue of bonds to the amount of $922,000; 2, a mortgage to Greene C. Bronson and James T. Soutter, to secure bonds to the amount of $1,000,000; and, 3, a mortgage to the city of Milwaukee, to secure about $314,000. The Western Division was likewise incumbered: 1, by a mortgage to Greene C. Bronson, James T. Soutter, and Shepherd F. Knapp, known as the land-grant mortgage, to secure bonds to the amount of $4,000,000; and, 2, by a mortgage to Albert Helfenstein, to secure bonds for $200,000.

Judgments had also been rendered against the company prior to June 21, 1858, as follows:

1. One in favor of Selah Chamberlain, in the Circuit Court of the United States for the District of Wisconsin, on the 2d of October, 1857, for $629,089.72; 2. Another in the same court, on the 7th of October, 1857, in favor of Newcomb Cleveland for $111,727.31; 3. Another in the Circuit Court of Milwaukee County, in the spring of 1858, in favor of Sebra Howard for $25,000; and 4. Another in the last-named court in favor of the Mercantile Bank of Hartford, Conn., on the 12th of June, 1858, for $25,000.

On the 1st of June, 1858, the company, being embarrassed by a large floating debt, and by its obligations to persons who had mortgaged their farms to aid in building its road, determined to issue other bonds to the amount of $2,000,000, and secure them by another mortgage on its entire line of road between La Crosse and Milwaukee, subject to the prior mortgage incumbrances. Accordingly the mortgage now in suit was executed to William Barnes, trustee, on the 21st of June, 1858, to secure such an issue. It covered "all the property, real and personal, of said railroad company to be acquired hereafter, as well as that which has already been acquired; together with all the rights, liberties, privileges, and franchises of said railroad company in respect to said railroad from Milwaukee to La Crosse, except its land grant, but subject to all the prior mortgages above referred to." Afterwards, on the 11th of August, 1858, a mortgage supplemental to this was executed by way of further assurance. The mortgages thus executed contained a provision that if there should be default in the payment of interest for the space of fifteen days, the principal should become due, and the trustee, on the request of the holders of bonds to the amount of $100,000, should advertise and sell the mortgaged property.

Afterwards the following judgments were recovered against the company, namely, 1. One in favor of Edwin C. Litchfield, in the District Court of the United States for the District of Wisconsin, October 5, 1858, for $26,353.51; 2. Another in the same court, April 5, 1859, in favor of Nathaniel S. Bouton

for $7937.37; 3. Another in favor of Philip S. Justice and others, in the Circuit Court of the county of Milwaukee, for $2035.33; and 4. Another in the last-named court, in favor of E. Bradford Greenleaf, September 10, 1858, for $840.86.

At the time when the mortgage to Barnes was executed, the Revised Statutes of Wisconsin, § 33, c. 79, provided that, in case of any sale of a railroad " on or by virtue of any trust deed, or on any foreclosure of any mortgage thereupon, the party or parties acquiring the title under any such sale and their associates, successors, [and] assigns, shall have and acquire thereby, and shall exercise and enjoy thereafter all and the same rights, privileges, grants, franchises, immunities, and advantages in and by said mortgage or trust deed enumerated and conveyed which belonged to and were enjoyed by the company," so far as they relate to the property bought, in all respects the same as " such company might or could have done therefor had no such sale or purchase taken place; such purchaser or purchasers, their associates, successors, or assignors [assignees], may proceed to organize anew and elect directors, distribute and dispose of stock, take the same or another name, and may conduct their business generally under and in the manner provided in the charter of such railroad company, with such variations in manner and form of organization as their altered circumstances and better convenience may seem to require."

Afterwards, on the 8th of February, 1859, an act supplementary to c. 79 of the Revised Statutes was passed, by which it was provided that in case of any sale of a railroad in the State under a deed of trust, or on a foreclosure, if no one bid an amount equal to seventy-five per cent of the mortgage debt, the trustee might bid that amount or more, in his discretion, to the full amount of the debt and interest due, if competition should make it necessary; and that the estate so acquired by the trustee should " be held in trust for the holders of such outstanding bonds or obligations in the same manner as if they had become the purchasers, in proportion to the amount of such bonds or obligations severally held by them." Laws of Wisconsin, 1859, c. 10, p. 13.

On the 11th of the same month of February holders of the bonds secured by the mortgage in favor of Barnes, to the amount of more than one hundred thousand dollars, presented to him their request in writing that he proceed to sell under his trust, and that he purchase the property at the sale for the bondholders at the price of seventy-five per cent of the outstanding bonds and past due interest, and more if necessary, not exceeding the full amount of the debt, principal, and interest. Accordingly he advertised the property for sale pursuant to the provisions of his mortgage, and on the 21st of May, 1859, bought it under the authority of the act of February 8, 1859, and the request which had been made, at the price of $1,593,333.33, for the benefit of the bondholders. Two days afterwards he united with certain persons representing themselves to be the owners of bonds to the amount of $1,302,850 in the organization of the Milwaukee and Minnesota company, hereafter called the Minnesota company, under § 33, c. 79, of the Revised Statutes, to own and operate the railroad, and by the same instrument he transferred his purchase to the company. The capital stock was fixed at $2,500,000, and the articles of organization contained the following provisions in reference thereto :

"Article IV. The stockholders of the said Milwaukee and Minnesota Railroad Company are the holders of the said bonds, secured by the said mortgages or trust deeds, for whose benefit the said sale and purchase was made by the said William Barnes, and such other persons as shall hereafter associate themselves with them by subscription to the said capital stock or other proper means.

"Each holder of the said bonds, upon surrendering his bonds to the proper officer of the said Milwaukee and Minnesota Railroad Company, shall be entitled to receive a certificate of stock in the company hereby organized of an equal amount with the principal of the bonds so surrendered by him, subject, nevertheless, to the payment in money of the *pro rata* share of the costs, charges, and expenses of the said sale and of the organization, and of carrying the same into effect, being the proportion of the whole of such costs, charges, and ex-

penses as the amount of stock so to be issued shall bear to two millions of dollars.

"Article V. The payment of the said *pro rata* share of such costs, charges, and expenses is hereby declared to be a charge and lien upon the stock to which each holder of the said bonds is entitled. And the board of directors of the said Milwaukee and Minnesota Railroad Company shall have power to declare the right to such stock forfeited by the non-payment of such *pro rata* share of such costs, charges, and expenses in such manner as the said board of directors shall determine."

On the 5th of December, 1859, a bill was filed in the District Court of the United States for the District of Wisconsin, by Bronson and others, trustees, against the La Crosse company, the Minnesota company, Helfenstein, trustee, and Cleveland and Chamberlain, judgment creditors, to foreclose the land-grant mortgage on the Western Division, and on the 9th of the same month a like bill was filed in the same court against the same parties by Bronson and Soutter, trustees, to foreclose the mortgage to them on the Eastern Division. Under the bill for the foreclosure of the land-grant mortgage the Western Division was sold April 25, 1863, to purchasers who organized themselves, pursuant to § 33, c. 79 of the Revised. Statutes, into a corporation by the name of the Milwaukee and St. Paul Railway Company, to which the property so purchased was duly conveyed. This company will be hereafter referred to as the St. Paul company.

In the suit for the foreclosure of the mortgage on the Eastern Division such proceedings were had, that a receiver was appointed, who took possession of the mortgaged property, under an order of the court, and caused it to be operated by the St. Paul company, in connection with the Western Division. Afterwards, on the 18th of July, 1865, it was adjudged in this suit that the Minnesota company, upon the payment of the amount ascertained to be due on the Bronson and Soutter mortgage for interest, be permitted to redeem and take possession of the Eastern Division and the rolling stock which belonged to it. On the 28th of September, 1865,

a decree was entered finding due upon the mortgage $1,000,000 of principal and $454,937.39 of interest, and ordering a sale of the mortgaged property for its payment, but saving the right of the Minnesota company to redeem in the manner specified in the order of July 18. On the 3d of January, 1866, this company paid into the registry of the court the amount of money required to make the redemption. Thereupon all further proceedings under this suit for foreclosure were stopped, and on the 20th of January, 1866, the Eastern Division and its rolling stock were handed over by the receiver to the possession of the Minnesota company.

On the 18th of April, 1866, Frederick P. James, claiming to be the assignee of the judgment against the La Crosse company in favor of Newcomb Cleveland for $111,727.71, which had been recovered prior to the execution of the mortgage to Barnes, commenced a suit in equity in the Circuit Court of the United States for the District of Wisconsin against the Minnesota company, to enforce the lien of that judgment on the Eastern Division, as being superior to the title acquired by the company through the sale under the Barnes mortgage. Such proceedings were had in this suit that, on the 11th of January, 1867, a decree was entered finding due to James on this judgment $98,801.51, and ordering a sale of the Eastern Division for its payment, subject, however, to the liens of the mortgages prior to that of Barnes and to the lien of the Chamberlain judgment. Under this decree the property was sold and conveyed to the St. Paul company, March 2, 1867, for $100,920.94, and from that time that company has been in possession, claiming title adversely to the Minnesota company and to the Barnes mortgage.

On the 20th of April, 1863, while the suit for the foreclosure of the Bronson and Soutter mortgage was pending, and a few days before the sale of the Western Division under the foreclosure of the land-grant mortgage, Frederick P. James and Abram M. Brewer, claiming to be the assignees of the judgments in favor of Edwin C. Litchfield and Nathaniel S. Bouton against the La Crosse company, which had been recovered after the execution of the Barnes mortgage, and Philip

S. Justice and others, and E. Bradford Greenleaf, also judgment creditors, brought suit in the Circuit Court of the United States against the La Crosse company, the Minnesota company, and Selah Chamberlain, to set aside the mortgage to Barnes and his foreclosure thereunder, and to have the property sold free of that incumbrance for the payment of their judgments. In that suit a decree was rendered July 9, 1868, in accordance with the prayer of the bill, save only that the mortgage was adjudged to be valid to the extent of the bonds that had been actually negotiated by the company to *bona fide* holders. No further proceedings have been had in that suit, and no attempt has ever been made to carry the decree into execution.

Such being the conceded facts, Barnes, as trustee, brought this suit in the Circuit Court of the United States for the Eastern District of Wisconsin, on the 6th of June, 1878, against the St. Paul company, which had changed its name to that of the Chicago, Milwaukee and St. Paul Railway Company, the La Crosse company, and the Minnesota company, for the foreclosure of his mortgage. In his bill he alleges, as to the first foreclosure, 1, that it had been actually adjudged, in the suit of James and others, to have been fraudulent and null and void, and that the St. Paul company is estopped from asserting to the contrary, because that suit was brought by its procurement, and was in fact prosecuted by it and in its behalf, although in the names of James and his associates; and, 2, because the bondholders insist that the deeds of trust, "and the powers in trust conferred thereby, remain unimpaired and as they were before said proceedings for sale were had, . . . because they say:

"1. The said estate was a trust, and a trust can never be terminated without the consent of the *cestuis que trust* except by its due execution.

"2. Because the powers of sale granted by said deeds to your orator are powers in trust, and, not having been executed in conformity with the requirements of the deeds by which they were granted, remain unexecuted.

"3. Because the said act, c. 79, being repugnant to the Con-

stitution of the United States, no proper and legal execution of said powers could be made under its authority.

"4. Because the terms and conditions prescribed by the act were not complied with, and, therefore, even if the act were valid, the said powers still remain powers in trust unexecuted;" and it was insisted "that no number of bondholders less than the whole number entitled to the estate granted to your orator by said deeds of trust as security could, under § 33 of the statute laws of Wisconsin aforesaid, legally organize a corporation and vest in it the title to said estate, and so deprive bondholders not consenting thereto of their security, and that, inasmuch as bondholders to a large amount did not consent to the said sale and organization, the same were null and void."

As to the proceedings in the suits for the foreclosure of the land-grant mortgage, and for the enforcement of the lien of the Cleveland judgment under which the St. Paul company acquired title, the material averment, in the view we take of the case, is, that "the said Minnesota company, so called, had no title to said estate, called the third mortgage, conveyed to him (Barnes) by said deeds of trust, which could be barred by said decree of foreclosure of said land-grant mortgage, or by said decree of foreclosure, in the name of said James, upon the said Cleveland judgment, and that your orator retaining his title to said estate, and not being a party to said foreclosure sales, the said estate has ever remained, and now remains, in him, for the benefit of said *cestuis que trust*, said decrees and said pretences of the said defendants notwithstanding."

To this bill the St. Paul company filed a plea, setting up the original foreclosure, "with the knowledge, consent, and approval, and at the request of the bondholders;" the purchase at the sale by Barnes in trust for the bondholders, in accordance with the provisions of the act of February 8, 1859; the organization of the Minnesota company for the purposes and with the powers above stated; and the transfer of the property thereto. The plea then proceeds as follows:

"That thereupon said bondholders surrendered their said bonds to said corporation to be cancelled, and the same were

so cancelled, and the said corporation thereupon issued to said several bondholders in exchange for their said bonds the corporate·stock of said Milwaukee and Minnesota Railroad Company to an amount equal to the principal of said bonds so surrendered in pursuance of said articles of organization, and which said stock was so received by said bondholders in full satisfaction and payment of their said bonds, and that all of the bonds issued by said La Crosse and Milwaukee Railroad Company under said mortgages or trust deeds were then, at the organization of said Milwaukee and Minnesota Railroad Company, or subsequently thereto, so surrendered to said corporation to be cancelled, and were cancelled, and stock of said company issued therefor.

"That by the proceedings aforesaid the said mortgages or trust deeds so as aforesaid given to said William Barnes were foreclosed, and the right of redemption theretofore existing in the said La Crosse and Milwaukee Railroad Company to redeem said property from the lien of said mortgages or trust deeds was thereby barred and foreclosed, and the said mortgage interest, so as aforesaid conveyed by said mortgages or trust deeds to said William Barnes, became an absolute estate in fee simple to all of the property covered by said mortgages or trust deeds in the said Milwaukee and Minnesota Railroad Company, subject to the prior liens thereon, and that thereby the trust relation to said property created by said mortgages or trust deeds between the said William Barnes and the holders of the bonds issued under said mortgages or trust deeds ended, and that no trust relation in respect to said property now exists, or has existed, since the filing of said articles of organization between said William Barnes and said bondholders."

It is then alleged that the Minnesota company was made a party to the several suits under which the St. Paul company claims title; that it appeared therein and "was recognized and treated as the owner of the equity of redemption of said property by virtue of the aforesaid proceedings;" and that, "by means of the proceedings aforesaid, the said William Barnes ceased to have any right, title, or interest as trustee as afore-

said in, to, or upon or under the said alleged mortgages or trust deeds, and his said bondholders ceased to have any right, title, or interest in, to, or upon the premises described therein and purporting to be affected thereby, and at the time of filing said bill of complaint the said William Barnes had no right, title, estate, lien, claim, demand, or equity of redemption, as trustee or otherwise, of, in, to, or upon the premises described in the said mortgages or trust deeds."

This plea was set down for argument and sustained by the court, whereupon a replication was filed and proofs taken. After hearing, an interlocutory decree was entered April 21, 1882, finding that $1,010,400 of the bonds had been actually exchanged for stock in the Minnesota company; that $693,000 had either been cancelled by the company before their issue, or had been surrendered by their owners for cancellation, and had actually been cancelled, after being issued; and that $37,400, belonging to the St. Paul company, were then in court, and for which no claim was made under the trust. The total amount thus accounted for was $1,740,880, and as to these, it was adjudged that they constituted no valid claim against the La Crosse company under the mortgage, and that so far as they were concerned, the plea of the St. Paul company was sustained, and Barnes was entitled to no relief. As to the remaining $259,200 of bonds provided for in the mortgage, a reference was made to a master to inquire and report what, if any, were justly due and in equity entitled to payment out of the mortgage security. Under this reference the master took testimony and reported in favor of the following persons and for the following amounts:

1. Matthew H. Robinson, one bond, $100, on which was due for principal and interest . . . . . . $417 55
2. Frederick Van Wyck, assignee of William H. Sisson, 2 bonds, $1000, on which was due for principal and interest . . . . . . . . . . . . 4,175 50
3. A. S. Bright and A. C. Gunnison, 22 bonds, $10,900, on which was due for principal and interest . . . . . . . . . . . . . . . . 45,512 95

| | | |
|---|---:|---:|
| 4. Andrew J. Riker, 8 bonds, $800, on which was due for principal and interest | 3,340 | 40 |
| 5. August F. Suelflohn, 4 bonds, $800, on which was due for principal and interest | 3,340 | 40 |
| 6. M. M. Comstock, 2 bonds, $200, on which was due for principal and interest | 835 | 10 |
| 7. Mary Christie Emmons, 2 bonds, $200, on which was due for principal and interest | 835 | 10 |
| 8. Reid & Smith, 19 bonds, $6400, on which was due for principal and interest | 26,723 | 20 |
| 9. J. H. Tesch, 11 bonds, $1100, on which was due for principal and interest | 4,593 | 05 |
| In all, bonds $21,500 — due | $89,773 | 35 |

To this report exceptions were filed, which the court, after hearing, "being of opinion that said claims do not constitute under the mortgages . . . a valid lien upon the property," sustained and dismissed the bill. From a decree to that effect this appeal was taken.

The ultimate question for determination is whether Barnes, the trustee, and the bondholders secured by the mortgage to him, are bound by the decrees in the suits for the enforcement of the prior liens, namely, the land-grant mortgage, and the Cleveland judgment, to which the Minnesota company was a party. That depends on the legal effect of what was done by Barnes in 1859, for the purpose of foreclosing his mortgage and organizing the Minnesota company to take the property, under his purchase at that sale, in trust for the bondholders. It is now alleged that this was all null and void : 1, because it has been so adjudged in the suit brought by James and others ; and, 2, because the act of February 8, 1859, under which Barnes acted in buying at his own sale and organizing the company, was unconstitutional in its application to his mortgage, which was executed before its passage, and the bonds secured thereby. The claim is, that a purchase by Barnes himself at his own sale, without the payment of his bid in money, could not operate as a foreclosure of the mort-

gage, except with the consent of all the bondholders, which was never given.

The sufficiency of the first of these objections is to be determined by the averments in the bill, taken in connection with the exhibits to which they relate. As to the second, the St. Paul company pleads in substance that Barnes, in foreclosing his mortgage and in organizing the Minnesota company after his purchase, acted " with the knowledge, consent, and approval, and at the request of the bondholders."

1. As to the decree in the suit of James and others. The copy of the bill in that suit, which is one of the exhibits in this case, shows that it was filed by certain judgment creditors of the La Crosse company to collect their judgments. It is a creditors' bill, pure and simple, brought by James and his associates, " on their own behalf, and in behalf of all the creditors of the La Crosse and Milwaukee Railroad Company, who have or claim a lien upon the railroad of said company," and "who shall come in and seek relief by and contribute to the expenses of this suit," to obtain a sale of "all of the property, real and personal, franchises and privileges of the La Crosse and Milwaukee Railroad Company, or which was theirs at the time of said sale by Barnes, May 21, 1859," " subject to the prior claims " described in the mortgage to Barnes, "and that the proceeds of said sale be brought into court, to be divided according to the legal priorities of your orators and the other claimants thereto." It alleges, in substance, that the mortgage to Barnes was executed " for the purpose and with the design of bringing about a speedy sale of said road and its franchises, and cutting off the stockholders in said company, and to hinder, delay, and defraud the creditors of the said La Crosse . . . company, and passing the property in or to the road and its franchises to some of the directors of said company and their friends." The La Crosse company, although nominally a party to the suit, did not appear, and did not ask relief, and there is no pretence that the complainants either did or could prosecute the suit in behalf of the stockholders. If, as is alleged, the St. Paul company was the promoter as well as the real prose-

cutor of the suit, it is bound only to the extent it would be if it had been actually the complainant. The most that can be claimed in this behalf is, that it stands in the place of the complainants named in the bill, and is bound as they are bound; no more, no less.

The decree — which, with the opinion of Mr. Justice Nelson, announcing the judgment of this court in *James* v. *Railroad Company*, 6 Wall. 752, is one of the exhibits in this case — adjudges that the mortgage to Barnes was good and valid "as a security for the bonds issued under it in the hands of *bona fide* holders for value, without notice," which, it was found, did not exceed $200,000; that the foreclosure and sale be "set aside, vacated, and annulled," and the Minnesota company be "perpetually restrained and enjoined from setting up any right or title under it," because it was made in pursuance of a notice claiming that $2,000,000 of bonds had been issued, and there was default in the payment of $70,000 of interest when less than $200,000 had ever been negotiated to *bona fide* holders, and the foreclosure proceeding was in other respects irregular and fraudulent; and that all the right, title, interest, and claim which the La Crosse company had in the railroad from Milwaukee to Portage City be sold to pay the judgments in favor of the complainants, "unless prior to such sale the defendants pay to said complainants" the amounts due thereon.

Every decree in a suit in equity must be considered in connection with the pleadings, and, if its language is broader than is required, it will be limited by construction so that its effect shall be such, and such only, as is needed for the purposes of the case that has been made and the issues that have been decided. *Graham* v. *Railroad Company*, 3 Wall. 704. Here the suit was by and for creditors to set aside the mortgage to Barnes and the foreclosure thereunder, because made and had to hinder and delay them in the collection of their debts. The decree, therefore, although broader in its terms, must be held to mean no more than that the foreclosure was void as to these creditors, whose claims were inferior in right to that of the mortgage, and that the Minnesota company was restrained

and enjoined from asserting title as against them; and also that, if they undertook to sell the property to pay their judgments, the mortgage to Barnes should stand only as security for such bonds as had been actually negotiated by the La Crosse company to *bona fide* holders.

Such also was the judgment of this court in *Railroad Company* v. *Soutter*, 13 Wall. 517, which was a suit brought by the Minnesota company, June 4, 1869, to recover back the money it had paid to redeem the mortgage to Bronson & Soutter on the Eastern Division, for the reason that the foreclosure of the mortgage to Barnes was fraudulent, and it had been so adjudged in the James suit. In announcing the opinion of the court, Mr. Justice Bradley said, p. 523: "Who are the complainants? Are they not the very bondholders, self-incorporated into a body politic, who, through their trustee and agent, effected the sale which was declared fraudulent and void as against creditors, and made the purchase which has been set aside for that cause? . . . But the complainants are wrong in asserting that the property was not theirs. It was theirs. Their purchase was declared void only as against the creditors of the La Crosse and Milwaukee Railroad Company. In other words, it was only voidable, not absolutely void. By satisfying these creditors they could have kept the property, and their title would have been good, as against all the world. The property was theirs; but, by reason of the fraudulent sale, was subject to the incumbrance of the debts of the La Crosse company. This was the legal effect of the decree declaring their title void. Therefore, they were, in fact, paying off an incumbrance on their property when they paid into court the money which they are now seeking to recover back."

This being the extent of the legal effect of the James decree, it follows that, if the proceedings by Barnes in 1859 for the foreclosure of his mortgage were sufficient in form, the Minnesota company represented that mortgage, and the holders of the bonds secured thereby, in the suits to which it was a party brought to enforce the prior liens under which the St. Paul company claims title, and that both Barnes, the trus-

tee, and the bondholders are bound by the decrees therein. The La Crosse company has never disputed the title of the Minnesota company, and the prior lien holders recognized it as good when they proceeded against the company to enforce their respective rights. The property has been lost, not because the foreclosure was invalid, but because it was all needed to satisfy liens which were prior in right to that of the Barnes mortgage, under which alone the company claims title. When the creditors in the James suit undertake to carry their decree into execution it will be time enough to consider how far they are bound by the decrees in the suits for the enforcement of the prior liens which were all obtained and executed pending their litigation with the company. We are now dealing only with Barnes and the bondholders claiming under him.

2. As to the plea. The bill in effect concedes, as is necessarily true, that if all the bondholders consented to a foreclosure under the act of February 8, 1859, the purchase of the property by the trustee for their benefit, and the transfer of title by him to the Minnesota company as their representative, would be good, even though without such consent it might be bad. The plea alleges such a consent, and also an actual exchange of all the bonds for stock in the company. The material question thus presented is, whether the bondholders consented to what was done by the trustee in their behalf. If they did, it matters not that some have omitted to surrender their bonds for cancellation, and take certificates of stock in exchange. If they assented to what was done they became in law purchasers at the foreclosure sale, and, as such, stockholders in the company which was organized under the statute in their behalf to take the property from their trustee, and that, too, without any formal surrender of their bonds. Their stock was bound for the payment in money of their respective pro rata shares of the costs, charges, and expenses of the sale, and of the organization of the company and of carrying the same into effect. If they wanted certificates of stock, they were required to surrender their bonds and pay what was due from them on this account, but as bondholders, purchasing

through their trustee, they became by the express terms of the articles of organization stockholders in the new corporation, with a lien on their shares for their proportion of the expenses, &c. The averment in the plea of an actual surrender of bonds for cancellation, and an issue of stock in exchange therefor, presents an immaterial issue. The voluntary exchange of bonds for stock would show a positive assent to the foreclosure, but a failure to do so would not necessarily imply dissent.

The exact issue to be tried, therefore, is whether the necessary consent was actually given. The enabling statute was approved February 8, 1859, and on the 11th of the same month, only three days afterwards, the requisite amount of bondholders presented their request to Barnes that he proceed to foreclose the mortgage and buy the property for the bondholders under the authority thus conferred on him for that purpose. In accordance with this request, he advertised the sale, and made the purchase May 21, 1859. Two days afterwards he organized the company, under the statute, to take the title from him as trustee for those in whose behalf he bought. From that time forward, during all the protracted litigation which ensued, this company claimed to own the property, subject only to the incumbrance of prior liens, and neither Barnes nor any bondholder, so far as this record discloses, ever asserted the contrary until after the James suit was decided, when the St. Paul company was in possession under its purchases upon decrees for the enforcement of the prior liens in suits to which the company was a party. During all this time the Minnesota company was active in asserting its title, and its litigation with the prior incumbrancers was constant and energetic, as the records of this court show in *Bronson* v. *La Crosse Railroad Co.*, 1 Wall. 405; *S. C.* 2 Wall. 283; *Milwaukee Railroad Co.* v. *Soutter*, 2 Wall. 440; *S. C.* 2 Wall. 510; *Graham* v. *Railroad Co.*, 3 Wall. 704; *Milwaukee Railroad Co.* v. *Soutter*, 5 Wall. 660; *Railroad Companies* v. *Chamberlain*, 6 Wall. 748; *Railroad Company* v. *James*, 6 Wall. 750; *Railroad Company* v. *James et al.*, 6 Wall. 752.

The amount of bonds authorized by the mortgage was

$2,000,000. The proof is abundant that of this amount $1,010,400 were actually converted into stock, and that $730,400 had either been surrendered for cancellation because they had never been issued, or because the holders made no claim against the La Crosse company on their account. The findings of the court below show the particulars as to the whole of these two amounts, and we are entirely satisfied with the correctness of the conclusions there reached. Some of the holders claim that they were persuaded against their own judgment, and, perhaps, against their will, to make the exchange, but still their bonds were actually surrendered and certificates of stock taken in exchange therefor. They kept silent during all the time the litigation with the Minnesota company was going on, and uttered no complaints until after the James' suit was decided against their interest then represented by that company.

There remained, however, at the time of the rendition of the interlocutory decree below, $259,200 of bonds unaccounted for, and a reference was made to a master to receive claims therefor, and to take testimony and report thereon. Under this reference bonds to the amount of $21,500 were presented to and allowed by the master. None of these bonds had been actually surrendered to the company and exchanged for stock, but after a careful examination of the testimony we have no hesitation in deciding that, at the time of the foreclosure, they were held and owned by parties who in law consented thereto, and that the present holders took them with full notice of that fact.

Of the amount allowed by the master, Bright & Gunnison alone represent $17,300, although Reid & Smith have a claim on $6400 thereof for money advanced. Both Bright and Gunnison were officers in the Minnesota company, and at times very active in the management of its affairs. Of the bonds which they represent $7500 were owned by William E. Cramer at the time of the foreclosure, and he signed the request to Barnes that he sell the property and buy it for the bondholders under the statute. These bonds were bought by Bright and Gunnison, or some person whom they represent, after this

suit was begun, Cramer receiving for them $900. The rest of the bonds which they present were undoubtedly owned by them while they were acting as officers of the company, and as such defending the suits for the enforcement of the prior liens, if not at the time of the original foreclosure by Barnes.

Suelflohn, who presents a claim for $800, actually owned his bonds at the time of the foreclosure and signed the request that was presented to Barnes. Robertson, who claims $100, was a clerk in the office of Barnes when the bonds were issued, during the foreclosure, and for many years afterwards. He received his bond for services in connection with this business. Mary Christie Emmons claims $200 for bonds she got from her father, one of the original organizers of the company, and named in the articles of organization as one of the directors, a position which he occupied for several years afterwards. Maria M. Comstock's claim is for bonds she got from her father, Leander Comstock, who held them at the time of the foreclosure, and who then did and ever since has resided in Milwaukee, and presumably had knowledge of what was being done. Frederick Van Wyck, who claims $1000, is a son-in-law of Bright, and the bonds he presents were bought by him at the suggestion of his father-in-law from William H. Sisson for a small sum after they had been filed as a claim by Sisson himself. Sisson was a lawyer in Chicago, but whether he owned the bonds or held them for others does not appear. Andrew J. Riker, who claims $800, was a broker in New York at the time of the foreclosure and before and after. He owned the bonds he now presents at that time and must have been familiar then with all that occurred, for he held land-grant bonds also, and says that after the foreclosure of that mortgage he laid them aside as of no value, because he "thought the thing was all closed up." John H. Tesch, who claims $1100, held his bonds at the time of the foreclosure. He resided then and since in Milwaukee, and was familiar in a general way with all that was done. He knew of the Barnes foreclosure, though he says: "I did not know that my bonds had anything to do with it; I did not follow that up; it was a common report mentioned in the newspapers, but did not

know it concerned me." But before that he had been informed by his counsel that they were good for nothing and would not be paid.

Under these circumstances, we cannot do otherwise than decide, that the silence of the holders of these few bonds, during all the time the Minnesota company was acting in their behalf, is equivalent to actual consent to the sale under which the company got the right to represent their interests in the litigation with the prior lien holders. They are the only persons, so far as the record discloses, who did not actually surrender their bonds and take certificates of stock therefor, and it is now too late for them to say that what their trustee did in their behalf was without authority. There cannot be a doubt that they knew of the foreclosure at or near the time it took place. If the purchase was not made for their benefit under the act of 1879, the trustee was accountable to them in money for their proportion of what he bid for the property. For this they never applied, and it must, therefore, be assumed that he bought for their account, as well as that of the other bondholders, and that they assented thereto.

It follows that the plea has been sustained by the evidence, and this necessarily disposes of all the other questions in the case. The sale by Barnes to the company under the foreclosure divested him of title and of his right to bring suit in behalf of bondholders. The decree in the James suit did not dissolve the Minnesota company. It simply established the right of the judgment creditors who brought that suit to redeem the Barnes mortgage, by paying the amount due for bonds that had been actually negotiated by the La Crosse company to *bona fide* holders, and to have the mortgaged property sold subject to such a lien. The company still continued in existence and still owned the property that had been bought, subject only to the inferior liens of the creditors whose rights had been established.

Neither can Barnes now take advantage of the alleged frauds or irregularities in the foreclosures of the prior liens. He not only has no title under which he could proceed for that purpose, but all such questions were settled and finally disposed

of in the decrees to which the Minnesota company was a party.

So, also, of the claim which was made before the master to recover back the money paid to redeem the Bronson and Soutter mortgage. That money was paid by the Minnesota company, and that company alone can sue for its recovery. Such a suit was once brought and a decree rendered against the company.

The decree of the Circuit Court dismissing the bill was right, and it is consequently

*Affirmed.*