CENTRAL VERMONT RY. CO. v. BETHUNE.

(Circuit Court of Appeals, First Circuit. June 20, 1913.)

No. 1,016.

MASTER AND SERVANT (§ 204*)—EMPLOYER'S LIABILITY ACT—ASSUMED RISK.

Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1911, p. 1322), imposes a liability on interstate carriers for injuries to servants, and section 4 declares that, in any action brought against any common carrier under the act to recover damages for injuries to or death of any of its employés, such employé shall not be held to have assumed the risk

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of his employment in any case where the violation by such common carrier of any statute enacted for the safety of the employés contributed to the injury or death of such employé. *Held*, that such section limited the abrogation of the doctrine of assumed risk in such cases to instances where the violation of an express statutory duty by the carrier was charged, and hence such doctrine was applicable to an action under the statute for the death of a railroad employé engaged in interstate commerce resulting from the alleged negligence of the railroad company in constructing its tracks too close together.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 544–546; Dec. Dig. § 204.*]

In Error to the District Court of the United States for the District of New Hampshire.

Action by Hannah Bethune against the Central Vermont Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

George F. Morris, of Lancaster, N. H. (Drew, Shurtleff & Morris and Harry B. Amey, all of Island Pond, Vt., on the brief), for plaintiff in error.

Henry F. Hollis, of Concord, N. H. (Hollis & Murchie, of Concord, N. H., and Raymond Trainor, of White River Junction, Vt., on the brief), for defendant in error.

Before PUTNAM and DODGE, Circuit Judges, and BROWN, District Judge.

PUTNAM, Circuit Judge. This is a suit for damages under the employer's liability statutes of the United States, with a verdict and judgment for the plaintiff, followed by this writ of error by the defendant. By the word "plaintiff" we mean the plaintiff below, and by the word "defendant" we mean the defendant below. Numerous points were raised, but we need consider only two. The allegations of the declaration which we need refer to are as follows:

After alleging sufficient to establish the character of the defendant as an interstate commerce carrier, they proceed:

"That the defendant at said White River Junction, at a point opposite a certain icehouse of a certain corporation styled Swift & Co., wrongfully, unlawfully, and negligently maintained, and suffered to be maintained, as a part of its roadbed, three several lines of railroad track, nearly parallel, and situated so close together and constructed in such a careless and negligent manner as to endanger the lives and limbs of employés who might have occasion to stand or pass between trains of cars situated on said three several lines of railroad track, or to ride or climb upon the cars of said trains passing each other on said tracks; that on the 1st day of September, 1909, plaintiff's intestate was employed by said defendant as a sealer, to take the number of seals and cars passing from said state of Vermont into the states of New Hampshire and Massachusetts and carrying commerce between said White River Junction and Lebanon, in said county of Grafton and state of New Hampshire, and between said White River Junction and Springfield, in the county of Hampden and commonwealth of Massachusetts; that while in the exercise of due care and in the performance of his duties as such sealer, and engaged in interstate commerce, as said intestate was passing or standing between two trains of freight cars situated on two adjoining tracks opposite said icehouse, being two of the three several lines of railroad track afore-

said, one of said freight trains was carelessly, improperly, and negligently started in motion, without warning to said intestate, by said defendant, its officers, agents, and employés, so that said intestate was crushed between the two trains of freight cars aforesaid, by reason of the defective, negligent, and unlawful condition of said roadbed, as aforesaid, and by reason of the careless, improper and negligent starting of said freight train, without warning to said intestate, as aforesaid, and said intestate was thereby so injured, bruised, and maimed that he died."

We will consider mainly the question of the assumption of risk as known at common law, including the subordinate question whether that defense is available under the statutes of the United States on which the suit was based.

The propositions in reference thereto are complicated because the plaintiff rests its case on a multiple, or double, charge of negligence, viz.:

First. The relation of the tracks of the defendant corporation to the trains situated thereon, as we will explain.

Second. The alleged negligence of the yardmaster, to which we will refer.

If the negligence of the yardmaster was found by the jury to have been an element in the plaintiff's case, the question of assumption of risk might not have been important, because there might have been no unusual risk with proper care on the part of the yardmaster; and there is no evidence in the record that the yardmaster was habitually negligent, or, if habitually negligent, that the deceased had knowledge of that fact. But it is not improbable that the jury failed to find that the yardmaster was negligent, so that the entire negligence found by the jury may have been in the construction of the tracks, and in the location of the trains, two matters as to which the deceased was perhaps thoroughly informed, and as to which, at common law, he perhaps assumed the peril incident to the situation.

The rulings of the court, however, took no note of this peculiarity in the plaintiff's case: so that, if they were erroneous in any view of the evidence which the jury might have accepted, there was prejudicial error.

The point on this question of assumption of risk was clearly raised by request for instructions, as follows:

"The jury should take into consideration plaintiff's knowledge of the dangers of the situation derived from his experience, and if you find he was fully informed of the dangers incident to his work your verdict should be for the defendant."

There was an accompanying request which asked the court to instruct the jury that certain conditions, supposed to exist, did not constitute "negligence in law"; but expressed in this form it was fatally bad. As to the request which we have quoted, the court instructed the jury as follows:

"Under the old law, take the first instance, if this place was faulty—in other words, not a reasonably safe place—and if Bethune knew it was dangerous, or understood it was dangerous, he would assume the risk; but that doctrine, or that theory, as has been claimed, has been overthrown by this federal statute which declares in effect that the assumption of risk or contribu-

tory negligence, which is largely the same thing, where a man voluntarily goes into a dangerous place, is not a full defense.

"It seems to have been the policy of Congress, and it is generally accepted, I think, as a sound public policy, that those old ancient rules are too harsh to be administered under present economic conditions, so Congress has seen fit. so far as it may go—and that is only so far as concerns interstate business—to overthrow those rules and say in effect that if there was fault on the part of an employer or any of its agents the fact that the injured party knew of the dangerous situation, and the hazards of it, or knew that he was to work in connection with a coservant for whose fault he was formerly responsible, is not now a full defense.

"I have been requested to say—and I have already said it in effect—that whatever knowledge this injured party had about the dangers of the situation is not to be considered on the question of the defendant's liability."

It is clear, therefore, that, in any view of the record, the position at the trial was plainly understood by both court and counsel, with reference to the question of assumption of risk.

We give the detailed alleged facts of the case from the brief of the plaintiff, because at every point we must on the issues we are considering take the view of the plaintiff as to what the jury might have been justified in finding. As claimed by the plaintiff, they were as follows:

"Donald Bethune was a car sealer in the White River Junction yard. His work consisted in taking the numbers of cars and the numbers of seals on all loaded box cars coming into and going out of White River Junction, as well as calling crews for trains and getting the arriving and leaving time of all passenger cars.

"It was his duty to examine cars coming into the yard, take the numbers and initials and impressions on the seals, and record them in a book in the yard office for future reference. The seal numbers were taken on a small book that he carried around with him and from it copied into the station record.

"He took the record of all cars that passed through White River Junction while he was on duty. He worked from 7 a. m. to 7 p. m. daily, and probably took the numbers of 20 trains during that time. Bethune had done this work for 30 years. Wherever it was most convenient for him, he took the car numbers, and, of course, it was more convenient to get them before the trains were broken up, but in any event he had to complete his job on each train and examine every car. The seals referred to were little pieces of lead, pressed with the number and initials of the road and pierced with wire, with which they were fastened to the car door.

"In the northerly part of the Central Vermont yard at White River Junction, Swift & Co. maintained an icehouse used for the purpose of supplying ice to refrigerator cars which stopped there. Bethune often took the car numbers and seals of trains at this place. In fact, his duties took him to all parts of the yard. The work at the icehouse was done while the cars were being iced, but Bethune worked wherever the train happened to stop, catching the trains wherever he could, it being his business to go to them wherever they were and get their car numbers. He operated about a mile on either side of the White River Junction station. In doing his work Bethune usually commenced at the forward end of a train and worked to the rear of one side, taking the numbers on the other side on his way back.

"When injured, plaintiff's intestate was working on train 404, coming from the north through White River Junction. It was known as a freight extra, carrying perishable stuff that required icing at the icehouse. It was also called the butter train, and came in over the Central Vermont from St. Albans to White River Junction. Immediately upon the arrival of the train Bethune commenced to take the car seals. At the time of the accident he had taken the numbers and seals down on one side and was coming up on the other, taking seals between the two trains.

"As previously said, there was an icehouse belonging to Swift & Co. at the time of the accident at White River Junction. It was used for storing ice, and located in the northerly part of the Central Vermont yard. Between the icehouse and the White River there were three tracks. The one nearest the river was the passenger main line. West of this was the freight line, and immediately west of the freight line was the icehouse track. The icehouse was the usual stopping place for all trains in the summer time that had to be iced. Most of the trains with refrigerator cars going south stopped there.

"In one place between the main freight line and the icehouse siding the space grows narrow. Towards the south end it is a little narrower than at the other end. Above the icehouse there is more room between these two tracks. Just south of the center of the icehouse the tracks come to the very narrowest point. There the roofs of cars project out so that they are closer than the bottoms of the cars.

"Bethune was injured in front of the Swift icehouse at the north end of the yard about midway of the icehouse, perhaps a little to the north of the center, if anything. The butter train was on the main freight line, the middle of the three tracks. A dairy train, No. 759, had pulled in on the icehouse track, coming from the north, from which direction the butter train also came. The butter train had come in on the main freight line going south, and after that the dairy train had pulled in on the icehouse track going south. The butter train had stopped on the main freight line, and five or six cars were cut off, taken south, backed north onto the icehouse siding, and were iced, pulled out, and backed onto the train again and coupled on. The dairy train pulled onto the ice house track right after the five or six cars mentioned had been pulled out, and had come to a rest before these cars were coupled onto the butter train.

"When the butter train started south it was going about twice its length onto what was called the straight track to be inspected; the dairy train remaining stationary. The first Fitzpatrick, a man who was present, knew of the trouble, he heard a cry, and, looking back, saw Bethune between the roofs of both cars. He was being rolled between a car of the butter train and a car of the dairy train, his body about half above the roofs, and, after he had revolved between the cars back to the gap, he was released and dropped. Fitzpatrick thinks he was climbing up over on extra 404 or onto the dairy train, and when he got to the top he naturally swung around, and his body was caught."

This statement of facts alleged by the plaintiff complemented the propositions of the declaration to which we have referred as to a double negligence, namely, that of the manner and maintenance of its tracks by the defendant corporation, and that of the omission of a warning by the yardmaster, Fitzpatrick, in the following language:

"There is nothing complex or concealed about the evidence of negligence upon which this action is based, and for which the defendant is legally responsible. It consisted in the failure of Fitzpatrick, the White River Junction yardmaster, who had charge of and was directing the movements of the butter train, to give the deceased timely warning of his intention to signal the train to start, although knowing of Bethune's presence in a place where he was likely to be injured by such movement, and in the maintenance by the defendant of its tracks in such condition that cars upon them came close together, so close that persons working between them were likely to get squeezed."

We pay little attention to the mere fact of the location of the tracks in the way described, although we do not deny that, under the particular circumstances, the jury might perhaps have found that the construction was negligent, nor especially that, under the particular circumstances, the defendant corporation was negligent in allowing its trains

to be sealed at that precise locality, and in not requiring that the sealing should be done at one of the other neighboring localities described by the plaintiff. Presumably, nevertheless, the mere matter of the location of the tracks would not be held negligent in New England, where the approximation of tracks to each other is very close in so many localities, especially about the terminals and the yards of railroads, so that denunciation of them as unauthorized, or the maintenance of them as negligent, would require reconstruction beyond what could possibly be regarded as reasonable. Under the circumstances of the case, we leave that to further investigation by the court of first instance with a full opportunity therefor. It is enough now to say that, under proper instructions by the court, the jury might have found that, with the knowledge of the premises possessed by the deceased car inspector, he might well be held at common law to have assumed the risk under some circumstances.

Perhaps the leading case, and the one absolutely close to this at bar on this point, is Tuttle v. Railway, 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114, where it was held that the construction of the tracks within a railroad freight station or yard was perilous, arising from the sharpness of the curves, and was yet held to involve a danger assumed by the employés who were familiar therewith. The dangers were presumed, at page 195 of 122 U. S., 7 Sup. Ct. 1166, 30 L. Ed. 1114, to have been known to an experienced brakeman accustomed to the yards in question, where the ruling of the trial court in directing a verdict for the defendant on this account was sustained. It was said, at page 194 of 122 U. S., 7 Sup. Ct. 1166, 30 L. Ed. 1114, that any rule of law restricting a railroad company as to such questions would leave to the varying and uncertain opinions of juries the determination of engineering questions, and that it must be a very extraordinary case where the discretion of such corporations in such matters should be interfered with, and that the brakemen and others employed to work in such situations must decide for themselves whether they will encounter the hazards incidental thereto. To a similar effect were the extracts from Judge Cooley approved on page 196. Tuttle v. Railway, and its substantial expressions, were reaffirmed and applied with reference to the construction of a water tank as late as Choctaw R. R. Company v. McDade, 191 U. S. 64, 68, 24 Sup. Ct. 24, 48 L. Ed. 96, and meanwhile, in Southern Pacific Co. v. Seley, 152 U. S. 145, 153, 14 Sup. Ct. 530, 38 L. Ed. 391, and elsewhere.

Tuttle v. Railway, and all the observations contained in it, would apply fully in behalf of the defendant at bar if the entire negligence charged had been with reference to the construction of the tracks, unless there is within the record some exceptional circumstances not called to our attention by either party. Plain it is that at common law the defendant would have been entitled to have had instructions as to the assumption of risk in the line of the cases cited, if that had been the only alleged negligence on the part of the defendant.

However, there are varying phases presented by the case before us, in view of which we are bound to say that it was impossible for the court, having due regard for the law, to take the whole case from

the jury; and no exception based on a claim for a ruling of that kind can be sustained. Aside from that, there are various phases, as follows:

First, if the jury had found that it was the duty of the yardmaster to warn the intestate car inspector, as claimed by the declaration and propositions of the plaintiff, several positions might follow, namely:

As to the neglect of the yardmaster, there is nothing in the record to justify any claim of the assumption of risk which might perhaps exist if the practices of the yardmaster were different from what they ought to have been, had been continuous, and had been known to the intestate, in which case the intestate might have been required to look out for himself; and further it follows that, if it was the duty of the yardmaster to warn the intestate, and the intestate had no reason to understand that he would not warn him, there was no risk to be assumed, because there could have been no special risk under the circumstances. The jury might have found this; and, if the record had shown that it did so find, the verdict might be required to stand. But, as the case went to the jury, this position cannot be reasonably supposed to have existed. On the other hand, the jury might have found, under the instructions of the court, that there was no negligence except in the construction of the tracks. In view of that fact, the defendant at common law would have been entitled to an instruction upon the assumption of risk, as argued for by the defendant; and the instruction given would have been error. Therefore we have only to consider the question whether, under the United States statutes, it is true that the doctrine of assumption of risk does not apply, as held by the court, and as now maintained by the plaintiff. We are of the opinion that it does apply, and that the instruction in question should have been given, if not in the precise form requested, yet in substance.

The statutes as amended are conveniently found in the Employer's Liability Cases, 223 U. S. 6, 7, and 8, 32 Sup. Ct. 169, 56 L. Ed. 327. The only thing therein expressly relating to this topic is section 4, appearing on page 8 of 223 U. S., 32 Sup. Ct. 169, 56 L. Ed. 327, to the effect that no employé shall be held to have assumed the risk in case of violation of "any statute." This section by its letter is clearly limited to a violation of a statute. In the case at bar there was no violation of any statute. There is merely a liability for the recovery of damages under certain circumstances; that is, by reason of certain defects or insufficiencies existing at common law. It is hardly to be presumed that Congress would enact statutory directions about the construction of railroads in New England in the particular involved here, where a compliance with such a statute would be perhaps ruinous. In order that the provision might apply here, instead of using the words "violation of any statute," it should have been broadened out to cover all the obligations of a carrier required either by the common law or by statute; and the construction now claimed by the plaintiff for this provision is too extreme and unnatural to be accepted.

The plaintiff also relies on section 5, referring to "any contract, rule, regulation or device" looking to an exemption of the common carrier, that clearly has relation to some express undertaking or de-

vice of a specific character, aside from mere implication of liabilities and rights growing out of the mere matter of employment. In the attempts made by various courts and text-writers to explain and support the doctrine of assumption of risk, there are many expressions indicating the view that it is implied in the contract of employment; but there is nothing of the kind. It is merely a practical rule of common sense, which leaves to the owners of houses and other establishments, especially to agricultural holders, a necessary privilege of constructing and maintaining their premises according to special circumstances, the stringency of finances and the custom of the country. This proposition was properly summarized in Pollock on Torts (Webb's edition, 1894), where, in treating of the maxim of volenti non fit injuria, this particular topic was taken up, and the observation made distinctly at page 195 that the rule "is in itself independent of the contract of service or any other contract." A sufficient exposition of it is found in Tuttle v. Railway, already referred to, 122 U. S., where it is said, at page 194, that brakemen and others employed must decide for themselves whether they will encounter the hazards incident to the work, and that, "if they decide to do so, they must be content to assume the risk." The same proposition appears in the opinion in Texas & Pacific Railway Company v. Harvey, 228 U. S. 319, 33 Sup. Ct. 518, 57 L. Ed. ——, passed down April 14, 1913, as follows:

"On the branch of the case dealing with assumption of risk we think the charge of the trial court was as favorable to the railroad company as it could properly have been under the statute. If the doctrine of assumed risk applied to this case, it was because the alleged defect was so palpable and visible that Harvey was presumed to know of it, although there was no direct proof upon that subject, and, by continuing to work, to have taken upon himself the hazard of injury from that source."

That, we think, is all there is of it, and the notion that a practical rule like this must be reduced to the law of contracts is going beyond what is necessary.

Neither are there any authorities which assist the plaintiff on this branch of the case. Northern Pacific Railway Company v. Maerkl, 198 Fed. 1, 6, 117 C. C. A. 237, was not dependent upon any such question, as it was a case where there was negligent construction of a car of which the employé could have had no knowledge in advance; and there was mixed negligence on the part of both the owner of the car and the carpenter by whom it was repaired. This question was referred to by the court only incidentally and with no particularity. Sandidge v. Railway, 193 Fed. 867, 878, 113 C. C. A. 653, did not involve this question in any positive manner, nor in any way requiring any particular examination; and the practical result was not in contravention of anything we have here. It must have been hastily decided, because an examination of the McDade Case, the last case cited, shows that the holding in it was the reverse of the proposition for which it was cited, or certainly of any proposition we reach here. Railroad Company v. Tucker, 220 U. S. 608, 31 Sup. Ct. 725, 55 L. Ed. 607, was a rescript, where the situation was considered only with reference to the jurisdiction of one or all of the federal courts, where

there was a motion to dismiss or affirm; and, as is permissible in many cases, although the court might have overruled the motion to dismiss, it did affirm.

On the other hand, in two late decisions of the Supreme Court, it is very evident that the court proceeded on the theory that the doctrine of assumption of risk had not been shaken by the statutes, except under the limitations which we claim. Gulf Railway v. McGinnis, 228 U. S. 173, 33 Sup. Ct. 426, 57 L. Ed. ——, contains the following:

"It has also been assigned as error that the defense of assumed risk was, in legal effect, denied, because the court overruled a motion to instruct a verdict for the defendant. The defense of assumed risk was submitted to the jury under a full and fair general charge. In addition a number of special requests asked by the railroad company in respect of several aspects of the facts were given. The contention is that upon all the evidence in the case there was no sufficient evidence of any negligence for which the company was chargeable in law, and that in such case the death of the decedent must have been due to some assumed risk. We pass this by."

We have examined the Supreme Court record in that case, and we find that this assigned error was passed by because the local court in various forms had instructed the jury on the question of assumption of risk favorably to the defendant in the language of the common law. Of like impression is Seaboard Air Line Railway v. Moore, 228 U. S. 433, 434, 435, 33 Sup. Ct. 580, 57 L. Ed. ——. What is found in Employer's Liability Cases, 223 U. S. 1, 49, 50, 32 Sup. Ct. 169, 175 (56 L. Ed. 327), is even more efficient, as follows:

"The rule that an employé was deemed to assume the risk of injury, even if due to the employer's negligence, where the employé voluntarily entered or remained in the service with an actual or presumed knowledge of the conditions out of which the risk arose, is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employés contributed to the injury."

It is true this does not assume an affirmative, direct form in favor of our proposition, but it hardly could be used unless as much as that was meant. At any rate, this extract and the other references in opinions of the Supreme Court suggesting the assumption of risk as applicable under the statutes in question would not have appeared unless the court intended to maintain the existence or the continuance of the doctrine, because otherwise all these allusions to it would have been cut out by a short method.

The fact is that the reference to violations of statute to which we have alluded is only in line with a series of many decisions, of which The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148, is a sample, by virtue of which in collision cases a broad distinction is made against a vessel which is guilty of breach of an express statutory obligation, treating more lightly a vessel that is guilty only of a breach of a common rule of navigation.

The other questions, which may never come up again, we pass by. For the present we leave the case to stand on the fact that the District Court held that the statutes applicable practically set aside the common-law doctrine of the assumption of risk, so far as the questions involved here are concerned, as to which specific directions should have been

given with reference to all the relations of that doctrine to any state of facts which the jury might have been permitted to find.

The judgment of the District Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings in accordance with law; and the plaintiff in error recovers its costs of appeal.