## NATIONAL CIRCLE, DAUGHTERS OF ISABELLA v. NATIONAL ORDER OF DAUGHTERS OF ISABELLA.

(District Court, N. D. New York. August 1, 1918.)

No. 191.

1. CORPORATIONS ⬤⟿49(2)—NAMES—MUTUAL SOCIETIES.

In suit by plaintiff, a Connecticut corporation, to enjoin defendant, a New York corporation, incorporated prior to plaintiff, from using the name "Daughters of Isabella" in and as a part of its name, and from carrying on its corporate business anywhere and everywhere, *held* relief would be denied, there being no evidence of fraud, etc., on the part of defendant, which prior to plaintiff had established subordinate branches and used the name in all states outside of Connecticut, where it had been enjoined from using the same.

2. CORPORATIONS ⬤⟿49(2)—NAMES—MUTUAL SOCIETIES.

In suit by plaintiff, a Connecticut corporation, to enjoin defendant, a New York corporation incorporated prior to plaintiff, from using the name "Daughters of Isabella," etc., *held*, that the superior right of plaintiff, if it ever existed, to use said name outside of Connecticut, had, as against defendant, been lost by nonuser, abandonment, and laches.

3. EQUITY ⬤⟿71(1)—LACHES AND ACQUIESCENCE—LAPSE OF TIME.

Mere lapse of time not being of the essence of laches or acquiescence, the surrounding facts and circumstances are to be considered as well as the rights and interests of all concerned.

4. INJUNCTION ⬤⟿4—NATURE OF REMEDY.

Injunctions are granted to prevent, not to redress, injuries.

In Equity. Suit by the National Circle, Daughters of Isabella, against the National Order of the Daughters of Isabella. Bill dismissed.

See, also, 232 Fed. 907.

This is a suit in equity brought by the plaintiff, National Circle, Daughters of Isabella, a corporation of the state of Connecticut, to enjoin the defendant, the National Order of the Daughters of Isabella, a New York state corporation, from using the name "Daughters of Isabella" in and as part of its corporate name, or in carrying on its corporate business and activities anywhere and everywhere. The plaintiff claims a prior and exclusive right to the sole use of this name or these words "Daughters of Isabella." This is denied by the defendant, which is the prior corporation in date of incorporation, and prior to plaintiff in establishing subordinate branches and using the name in all the states where used outside of the state of Connecticut.

Borden H. Mills, of Albany, N. Y. (Charles F. Roberts, of New Haven, Conn., of counsel), for plaintiff.

P. H. Fitzgerald, of Utica, N. Y. (E. L. Smith, of Utica, N. Y., and Bernard E. Lynch, of New Haven, Conn., of counsel), for defendant.

RAY, District Judge (after stating the facts as above). In or about the month of May, 1897, a voluntary unincorporated association of ladies, exclusively of the Catholic faith, was organized at New Haven, Conn., under the name "The Ladies' Auxiliary of Russell Council, No.

65, Knights of Columbus." In fact, while a separate organization, it was auxiliary to the body known as "Knights of Columbus." It used a ritual, songs, odes, and installation exercises which were in the main, if not entirely, prepared by one Daniel E. Colwell, who was then national secretary of the Knights of Columbus. This ritual, etc., was founded on the historical incident of the sale by Queen Isabella of Spain of her jewels to furnish the means to equip the expedition of Columbus which resulted in the discovery of America. After a time allusion was made to said Queen of Spain in such ritual. At some time, not many months after the organization of such voluntary unincorporated association, some of the members thereof, both in public and private, and in speaking of the association between themselves and to others, referred thereto as "Daughters of Isabella," and thus such persons applied that name thereto and to the members thereof. Just how or when the name originated does not further appear. In or about 1898, at a meeting of the association, a committee was appointed to consider the subject of incorporating under the name of "Daughters of Isabella." Nothing of any account was done by them, however, until 1904. In 1901, about, some of the members of this association, "The Ladies' Auxiliary of Russell Council, No. 65, Knights of Columbus," procured and began to wear publicly a society pin on the face of which was displayed the figure of a bell with the letters "I" and "S" on either side thereof.

On the 12th day of February, 1904, at a meeting of that association the members of such association present voted to incorporate under and pursuant to the laws of the state of Connecticut under the name "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus," and March 7, 1904, certain members of the said association were incorporated under that name in the state of Connecticut, and thereafter there were received into membership therein all of the members of said unincorporated association who desired to join. This Connecticut corporation, "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus," has never dissolved or wound up its affairs or ceased to exist, but is to-day an existing corporation of the state of Connecticut; but it is claimed by the plaintiff that such corporation has become a part and parcel of the plaintiff here, "The National Circle, Daughters of Isabella," as one of its courts, and that it is now one of its subsidiary circles. The National Circle, Daughters of Isabella, the plaintiff herein, was thereafter and at the January, 1907, session of the General Assembly of the state of Connecticut, by act approved July 25, 1907 (Sp. Acts 1907, p. 402), duly incorporated by a special act of said General Assembly under the corporate name "The National Circle, Daughters of Isabella." This was done on the application of the incorporators named in the articles of incorporation so granted March 7, 1904, to the said "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus." To the plaintiff corporation by such special act was granted power to establish branches. There is no claim or pretense that the plaintiff corporation of July, 1907, absorbed or superseded or took the place of the former corporation of March 7, 1904, but that the earlier corporation became affiliated with and a part of the

later corporation, this plaintiff, as one of its subordinate branches or circles. The plaintiff's attorney so stated in the beginning of the trial. In the meantime and on the 24th day of June, 1903, and about nine months before the organization or incorporation of the first Connecticut corporation, and four years before the incorporation of the second Connecticut corporation before described, certain ladies and gentlemen of the city of Utica, Oneida county, in the state of New York, and that vicinity, eight in number, all of the Catholic faith, organized and duly incorporated, under and pursuant to the corporation laws of the state of New York, the defendant corporation by and under the name "Daughters of Isabella," and on that day its articles of incorporation were duly filed and it became a body corporate of the state of New York under its laws. Subsequently and on the 7th day of August, 1905, the name of this corporation was duly changed to "The National Order of the Daughters of Isabella." It commenced its corporate activities at once on its incorporation in 1903, and established subordinate branches or courts in different places in the state of New York, and also in several other states of the United States. These courts, with the dates, respectively, when established and where located, appear in table "A" annexed. In so establishing courts and extending its activities the defendant, by its agents or officers, went into the state of Connecticut about April 10, 1904, and established a court at Naugatuck, and March 12, 1905, March 14, 1905, May 5, 1905, May 21, 1905, June 4, 1905, January 7, 1906, March 4, 1906, January 20, 1907, May 3, 1908, and April 4, 1909, organized and established courts at other places in the state of Connecticut.

The articles of incorporation of this New York corporation do not expressly——that is, in terms——state any purpose of the corporation to establish courts or subordinate branches anywhere, and the plaintiff claims that all of its acts in so doing were ultra vires, null and void, and in violation of the plaintiff's rights. Such articles of incorporation do state, however, "the territory within which its operations are to be principally conducted is the United States of America and the Dominion of Canada." These subordinate courts or branches of the defendant corporation are not parties to this suit. It is evident that because of its activities or popularity, or for other legitimate reasons, the defendant corporation was prosperous, and through these courts extended its affiliated membership into several states of the United States before the plaintiff established circles there. The plaintiff corporation has established circles in the states named in table "B," annexed hereto, only and on the dates given therein. The membership of these courts and circles, respectively, is given in "A" and "B." I find no substantial evidence of fraud or deceit or of misrepresentation to any one made by defendant or its authorized officers or agents in establishing these courts. They seem to have been established because of the superior or greater activities of the defendant corporation. It is evident from "A" and "B" that the defendant was the first to establish itself, through its courts, in the following states of the United States, viz. Pennsylvania, Georgia, Wisconsin, New York, Iowa, Kansas, New Jersey, South Carolina, Florida, Illinois, Mississippi, Vir-

252 F.—52

ginia, Oklahoma, Louisiana, Missouri, Nebraska, Wyoming, Rhode Island, Texas, Oregon, South Dakota, California, Massachusetts, Idaho, New Hampshire, North Dakota, Vermont, Indiana, Minnesota, Washington, Montana, Maryland, and perhaps other states before the bringing of this action.

The pertinent clauses of the articles of incorporation of the New York corporation read as follows:

"1. That the name of said corporation shall be the Daughters of Isabella.

"2. The particular objects for which said corporation is to be formed are:

"A. For the purpose of promoting the social and intellectual standing of its members.

"B. For literary purposes.

"C. For the purpose of rendering such aid and assistance among its members as shall be desirable and proper, and by such lawful means as to them shall seem best.

"3. The territory within which its operations are to be principally conducted is the United States of America and the Dominion of Canada.

"4. The principal office of said corporation is to be located in the city of Utica, Oneida county, New York.

"5. That the number of its directors shall be six."

The pertinent clauses or sections of the Connecticut corporation, plaintiff here, read as follows:

"Sec. 2. The objects and purposes of said corporation shall be to render pecuniary aid and assistance to sick and distressed members and to the beneficiaries of members, whether such sickness be temporary or incurable, and to render pecuniary aid toward defraying the funeral expenses of members, and to promote social and intellectual intercourse among its members. * * *"

"Sec. 4. Said corporation shall have power to locate and establish state and district circles, local or subordinate circles, or other branches or divisions thereof under the name of Daughters of Isabella, composed of members of the order in any town or city in this state, or in any other state of the United States, or in any other country, and said state, district, or local circles, or other branches or divisions, when so established, shall be governed and managed by such laws, by-laws, rules, and regulations as said corporation shall determine; and said corporation may enforce such laws, by-laws, rules, and regulations against any such state, district, or local circle or circles, or other branches or divisions in any court of this state, or of any other state of the United States; and said corporation may grant charters to such state, district, or local circles, or other branches or divisions, and may authorize such state, district, or local circles to make, subject to the approval of the National Circle or some authorized officer thereof, such local by-laws as the needs of any state, district, or local or subordinate circle, or other branch or division may seem to require. * * *"

"Sec. 6. Said corporation shall be governed, managed, and controlled by the constitution, by-laws, rules, and regulations adopted by the voluntary association known as the National Body of the Daughters of Isabella formed pursuant to the amendment to the articles of incorporation of the Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus, approved by the secretary of the state, November 5, 1904, and now in force, until the same are legally changed, altered, amended, or repealed.

"Sec. 7. All funds and other property now belonging to the said voluntary association known as the National Body of the Daughters of Isabella are by this resolution made the funds and property of the corporation herein created, and subject to its constitution, by-laws, rules and regulations."

October 21, 1907, on complaint of "The Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus," and "The National Circle, Daughters of Isabella," the said two corporations

so organized and incorporated in the state of Connecticut, an action in which said two corporations were parties plaintiff was commenced and thereafter prosecuted in the superior court of the state of Connecticut against "The National Order of the Daughters of Isabella," the New York corporation, Annie E. Smith as state regent of the state court of the said order in the state of Connecticut, and also the several courts of the said "The National Order of the Daughters of Isabella," naming them as courts organized and doing business in the state of Connecticut. This complaint alleged the said voluntary association; the said name thereof; the idea on which based; the adoption and use of odes; the adoption and use of said pin in 1900; the use of the name "Daughters of Isabella"; and says the complaint, "and said name 'Daughters of Isabella' became the name by which the members of said organization were known among themselves and by many persons unconnected with said organization." The complaint also alleged the incorporation of March 7, 1904, in the state of Connecticut; the use of the same constitution, etc., as that of the voluntary unincorporated association; the amendment to the articles of incorporation and the formation of four subordinate branches in said state; also the said incorporation by special act at the January session of the Connecticut Legislature, approved July 25, 1907, and the affiliation of the subordinate branches therewith; also the organization and incorporation of said New York corporation; an application by it to the secretary of state of Connecticut to do business in the state of Connecticut and the denial of same, and the application by one Neary for a special charter creating him and others a corporation in Connecticut under the name of "The National Order of Daughters of Isabella" and the refusal of the Legislature to grant same; also the said change of name of the New York corporation, and that thereafter, with knowledge of the aforesaid facts, the said Neary and others unknown organized "subordinate branches or courts of the said New York corporation, 'The National Order of the Daughters of Isabella,'" within the territory of the state of Connecticut at places named. The said complaint also alleged that said defendant "The National Order of the Daughters of Isabella" had designated said courts and claimed the right so to do as "Daughters of Isabella," and that the members thereof were known among themselves by that name. The complaint then alleged confusion, etc., in name; that many persons joined the one body under the belief they were joining the other *in the state of Connecticut,* and that said New York corporation was seeking to organize other courts *"within said state,"* to the irreparable injury of plaintiffs, and also alleged false representations *"within the state of Connecticut."* The complaint demanded damages, and an injunction restraining the New York corporation *"from establishing any further branches within the state of Connecticut* under said name or title Daughters of Isabella," and also restraining the said branches of the New York corporation "now in existence *within the state of Connecticut from continuing to use said name or title."*

Although said New York corporation had established a large number of courts in several of the states of the United States other than

the state of Connecticut, and was engaged in so doing, no complaint was made thereof, and no relief was demanded or claimed restraining the New York corporation, or the other defendants, from establishing courts, or using the name "Daughters of Isabella," anywhere outside of Connecticut or in other states than Connecticut. In other words, under the allegations of the complaint and the issues framed by the answers, the right of the New York corporation to use the name "Daughters of Isabella," and to establish its courts in states outside the state of Connecticut, or states other than the state of Connecticut, was not challenged or in issue. A substituted complaint was filed, but this did not broaden the issue, and the injunction demanded was only to reach to the state of Connecticut. This action was brought to trial, after demurrers had been filed and heard, in March, 1910, and the following judgment rendered March 7, 1910, viz.:

"Whereupon it is adjudged that the defendant, the National Order of the Daughters of Isabella, and its servants and agents, be, and it is hereby, enjoined, under a penalty of one thousand dollars, from establishing any further branches within the state of Connecticut under said name or title. 'Daughters of Isabella,' and that all subordinate branches of said National Order of the Daughters of Isabella now in existence within the state of Connecticut be, and the same are hereby, forever prohibited and enjoined, under a similar penalty of one thousand dollars, from using said name or title, and that the plaintiffs recover of the defendants twenty-five dollars damages, and the costs taxed at ——— dollars and ——— cents."

The following findings of fact in that Connecticut case are pertinent:

"(1) That the plaintiff was organized as a voluntary benefit association by women of the Catholic faith, in May, 1897, under the name of 'The Ladies' Auxiliary of Russell Council, No. 65, Knights of Columbus.'

"(2) That from the time of its formation the members of this association made much use of the name of Isabella, a queen of Spain, in their ceremonies, ritual, and songs, and were in the habit of calling each other 'Daughters of Isabella.'

"(3) That early in 1898 the association by vote appointed a committee to consider the matter of incorporation under the name 'Daughters of Isabella,' but no further action was taken at that time.

"(4) That as early as 1901 the association adopted and its members began to wear publicly a society pin on the face of which were displayed letters and symbols indicating 'Daughters of Isabella, and by that name the association and its members then were commonly known and called among themselves and informally by the outside public.

"(5) That said association originated and was the first to use said name in this state as a name for a society and its members, and it and its successors have continued to use said name constantly until the present time.

"(6) That on February 12, 1904, this association voted to be incorporated under the laws of this state under the name 'Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus,' and on the 7th of March, 1904, said association was so incorporated, and it has continued to be known as the 'Daughters of Isabella,' and the members thereof to be known among themselves and to the public generally by that name.

"(7) That these articles of incorporation contained no provision for the establishment of branches of the corporation.

"(8) That before March 7, 1904, no other persons, or society, or corporation, had adopted and were using the name 'Daughters of Isabella' in this state, and no other organization was known by that name to the plaintiffs, or to the public generally in this state.

"(9) That said corporation was duly organized by the members of the original voluntary association, who became members of said corporation; and it adopted the same constitution, used the same ceremonies, ritual, songs, society

pin, and insignia, and continued to carry out the plans and purposes of the original voluntary association, and to use and be commonly known by the name 'Daughters of Isabella.'

"(10) That said corporation upon its organization became and thereafter continued to be the successor in title and all other respects to all the rights and privileges of said original voluntary association, including the rights to use the name 'Daughters of Isabella.'

"(11) That said corporation made an amendment to its articles of incorporation, which was filed with the secretary of state November 5, 1904, and by which it was authorized and empowered to establish branches under the name 'Daughters of Isabella,' and to give to such branches and their members the right to use said name.

"(12) That under authority of said amendment the plaintiff corporation formed four subordinate branches with a membership of about fifteen hundred, and all of the members have been always known among themselves and to the public as 'Daughters of Isabella.'

"(13) That at the January session of the General Assembly of Connecticut, in 1907, all of the incorporators named in the articles of incorporation granted to the plaintiff on March 7, 1904, all of whom were members of said corporation organized thereunder, for and in behalf of the plaintiff and all of its subordinate branches at that time in existence, made application for and were granted by a special act a charter by which said incorporators and those associated with them were created a body, politic and corporate, under the name and title of 'The National Circle, Daughters of Isabella,' with authority to establish branches in Connecticut and elsewhere.   *   *   * "

"(24) That of the fourteen courts or branches of the defendant New York corporation all except three were organized and established in Connecticut since the filing of the articles of incorporation of said corporation with the secretary of this state.   *   *   * "

"(27) That in December, 1906, the defendant New York corporation established a state court within this state, known as the 'State Court of the National Order, Daughters of Isabella,' of which the defendant Annie E. Smith is the regent and chief executive officer.  The state court was composed of the subordinate courts or branches in the state.

"(28) That said state court, said Annie E. Smith as its regent and chief executive officer, and the defendant William J. Neary as the agent and so-called territorial regent of said defendant New York corporation, have carried on within this state an active campaign for the organization therein of subordinate courts or branches of said New York corporation under the name and title 'Daughters of Isabella,' and have organized and established the subordinate branches or courts which are named as defendants in this action, having together a membership of about fifteen hundred.  Some of these courts were originally branches of the plaintiff corporation, which they have persuaded to leave and to join the New York corporation.

"(29) That said defendant New York corporation and each of its subordinate courts or branches in this state, through their agents and territorial regent and other officers, by speeches, advertisements, arguments, the circulation of literature, and the holding of public meetings and other means, have been attempting and threatening, and still are attempting and threatening, to organize other subordinate courts or branches of said New York corporation within this state, under said name and title 'Daughters of Isabella.'

"(30) That all of the defendants, by their acts within this state, have invaded the rights acquired by the plaintiffs; they have seriously and irreparably injured the plaintiffs' property in their name, which is essential to their corporate existence; they have occasioned loss and damage to the plaintiffs by confusing their identity; they have reduced the membership of the plaintiffs by persuading some of their subordinate branches to leave them and join the New York corporation, and have hindered the plaintiffs' growth in numbers and in new branches, and thus they have diminished materially the plaintiffs' means and opportunities for carrying on the business and objects for which they were organized; they have considerably reduced the

plaintiffs' pecuniary income, thereby decreasing their power to enjoy the advantages they designed to secure by their association and incorporation; and their continued use of this name will have the natural and necessary tendency completely to destroy the plaintiffs' corporate life. * * * "

"Second. The following conclusions have been reached:

"(1) That, having proved the facts alleged in the complaint, the plaintiffs were entitled to the relief asked for.

"(2) That the plaintiffs have acquired the exclusive right to use the name 'Daughters of Isabella' within this state.

"(3) That when the plaintiffs had acquired such a right the defendant foreign corporation should be restrained from using that name in this state, or one so similar as to confuse, mislead, or deceive the public, to the injury of the plaintiffs.

"(4) That the defendant corporation's name is so similar to the plaintiffs' name as to confuse, mislead, and deceive the public, to the injury of the plaintiffs.

"(5) That the plaintiffs' exclusive right to its name is one that carries with it the presumption of injury by interference, for which there is no adequate remedy at law, and which, therefore, a court of equity will restrain."

On appeal no error was found, and the judgment of the superior court was affirmed.

It is seen that this judgment of the Connecticut courts only assumes to find and adjudge that the plaintiffs, and its or their predecessor, the unincorporated association, was the first to use the name "Daughters of Isabella" *in the state of Connecticut,* and only assumes or purports to adjudge the rights of the parties *in that state.* It is not general in its findings or adjudication. It settled, and settles forever, the rights of the parties in that state and no other. Reynolds v. Stockton, 140 U. S. 254, 264, 265, 266, 11 Sup. Ct. 773, 35 L. Ed. 464; Radford v. Myers, 231 U. S. 725, 733, 34 Sup. Ct. 249, 58 L. Ed. 454; Vicksburg v. Henson, 231 U. S. 259, 269, 34 Sup. Ct. 95, 58 L. Ed. 209. It is confined in the issues framed, in the findings and in the terms of the decree itself, to the rights and acts of the parties in the state of Connecticut. The cause of action in that case is not identical with the one alleged in the instant case. The finding is explicit, referring to the unincorporated association: "(5) That said association originated and was the first to use said name in *this state* [Connecticut] *as a name for a society and its members,*" etc.; and, among the conclusions, "(2) That the plaintiffs have acquired the exclusive right to use the name 'Daughters of Isabella' within *this state* [Connecticut]."

From the rendition of that judgment, in March, 1910, down to the commencement of this action, about January or February, 1916, the defendant, at large expenditure of money, effort, and time, has been engaged in forming and establishing courts, and using the name "Daughters of Isabella" as applied thereto, in a large number of the states of the United States, and was the first so to do. The defendant corporation was so engaged in establishing courts in New York and several other states prior to the commencement of that action in the superior court of the state of Connecticut, and has been so engaged ever since. No legal action was taken to challenge or restrain such use of the name Daughters of Isabella in either of the states outside of Connecticut, or the establishment of such courts, which now have a

membership of some 25,000, until the commencement of this action, in the year 1916.

The acts and rights of the parties in the state of Connecticut and not elsewhere were pleaded, put in issue, tried, and adjudicated in and as to the state of Connecticut alone.

In Radford v. Myers, 231 U. S. 726, 733, 34 Sup. Ct. 249, 252 (58 L. Ed. 454), the court said:

"Judgments become estoppels because they affect matters upon which the parties have been heard, or have had an opportunity to be heard, but are not conclusive upon matters not in question or immaterial. Reynolds v. Stockton, 140 U. S. 254, 268, 269 [11 Sup. Ct. 773, 35 L. Ed. 464]."

In Reynolds v. Stockton, supra, the court, in speaking of section 1, art. 4, of the federal Constitution (the full faith and credit clause), said:

"It does not demand that a judgment rendered in a court of one state, without the jurisdiction of the person, shall be recognized by the courts of another state as valid, or that a judgment rendered by a court which has jurisdiction of the person, but which is in no way responsive to the issues tendered by the pleadings, and is rendered in the actual absence of the defendant, must be recognized as valid in the courts of any other state. The requirements of that section are fulfilled when a judgment rendered in a court of one state, which has jurisdiction of the subject-matter and of the person, and which is substantially responsive to the issues presented by the pleadings, or is rendered under such circumstances that it is apparent that the defeated party was in fact heard on the matter determined, is recognized and enforced in the courts of another state. * * *

"We are not concerned in this case as to the power of amendment of pleadings lodged in the trial court, or the effect of any amendment made under such power, for no amendment was made or asked. And, without amendment of the pleadings, a judgment for the recovery of the possession of real estate, rendered in an action whose pleadings disclose only a claim for the possession of personal property, cannot be sustained, although personal service was made upon the defendant. The validity of the judgment depends upon the fact that it is in no manner responsive to the issues tendered by the pleadings. This idea underlies all litigation. Its emphatic language is that a judgment, to be conclusive upon the parties to the litigation, must be responsive to the matters controverted. Nor are we concerned with the question as to the rule which obtains in a case in which, while the matter determined was not, in fact, put in issue by the pleadings, it is apparent from the record that the defeated party was present at the trial and actually litigated that matter. In such a case the proposition, so often affirmed, that that is to be considered as done which ought to have been done, may have weight, and the amendment which ought to have been made to conform the pleadings to the evidence may be treated as having been made. Here there was no appearance after the filing of the answer, and no participation in the trial or other proceedings. Whatever may be the rule where substantial amendments to the complaint are permitted and made, and the defendant responds thereto, or where it appears that he takes actual part in the litigation of the matters determined, the rule is universal that, where he appears and responds only to the complaint as filed, and no amendment is made thereto, the judgment is conclusive only so far as it determines matters which by the pleadings are put in issue. And this rule, which determines the conclusiveness of a judgment rendered in one court of a state as to all subsequent inquiries in the courts of the same state, enters into and limits the constitutional provision quoted, as to the full faith and credit which must be given in one state to judgments rendered in the courts of another state. * * *

" 'The inquiry is, had the court jurisdiction to the extent claimed? "Jurisdiction" may be defined to be the right to adjudicate concerning the subject-matter in the given case. To constitute this there are three essentials: First, the court must have cognizance of the class of cases to which the one to be adjudged belongs; second, the proper parties must be present; and, third, the point decided must be, in substance and effect, within the issue. * * * Persons, by becoming suitors, do not place themselves for all purposes under the control of the court, and it is only over these particular interests. which they choose to draw in question, that a power of judicial decision arises.' And again: 'A judgment upon a matter outside of the issue must, of necessity, be altogether arbitrary and unjust, as it concludes a point upon which the parties have not been heard. And it is upon this very ground that the parties have been heard, or have had the opportunity of a hearing, that the law gives so conclusive an effect to matters adjudicated. And this is the principal reason why judgments become estoppels. But records or judgments are not estoppels with reference to every matter contained in them. They have such efficacy only with respect to the substance of the controversy and its essential concomitants.' "

In Vicksburg v. Henson, supra, 231 U. S. at page 269, 34 Sup. Ct. 99, 58 L. Ed. 209, the court said:

"It is well settled, however, that a decree is to be construed with reference to the issues it was meant to decide. Graham v. Railroad Company, 3 Wall. 704, 710 [18 L. Ed. 247]; Reynolds v. Stockton, 140 U. S. 254 [11 Sup. Ct. 773, 35 L. Ed. 464]; Vicksburg v. Vicksburg Water Works Co., 206 U. S. 496, 507 [27 Sup. Ct. 762, 51 L. Ed. 1155]; Haskell v. Kansas Natural Gas Co., 224 U. S. 217, 223 [32 Sup. Ct. 442, 56 L. Ed. 738]. In Barnes v. Chicago, M. & St. P. Ry. Co., 122 U. S. 1, this court, speaking by Mr. Chief Justice Waite, said (page 14 [7 Sup. Ct. 1043, 1050 (30 L. Ed. 1128)]): 'Every decree in a suit in equity must be considered in connection with the pleadings, and, if its language is broader than is required, it will be limited by construction so that its effect shall be such, and such only, as is needed for the purposes of the case that has been made and the issues that have been decided. Graham v. Railroad Co., 3 Wall. 704 [18 L. Ed. 247].' "

[1] And independent of this, the plaintiff here is not entitled to the injunction or relief demanded. Hanover Star Milling Co. v. Metcalf, and Allen & Wheeler Co. v. Hanover Star Milling Co., 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713. Those cases were decided in one opinion, and concerned the use of a trade-mark or name "Tea Rose" as applied to flour. The gist of the decision as applicable here is that:

"The common law of trade-marks is but a part of the broader law of unfair competition. While common-law trade-marks and the right to their exclusive use may be classed among property rights, the right grows out of use and not mere adoption. Where two parties independently employ the same trade-mark or name, not in general use and susceptible of adoption, upon goods of the same class but in separate and remote markets, the question of prior appropriation is legally insignificant in the absence of intent on the part of the later adopter to take the benefit of the reputation, or to forestall extension of the trade, of the earlier adopter. While property in a trade-mark is not limited, so far as its use has extended, by territorial bounds, the earlier adopter may not monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another. So far as controversy over a trade-mark concerns intrastate distribution as distinguished from interstate trade, the subject is not within the sovereign power of the United States.

"Trade-mark rights, like others that rest in user, may be lost by abandonment, nonuser, laches, or acquiescence. Where a later adopter, in good faith and without notice of its use in other territory by an earlier adopter, expends money and effort in building up a trade in a territory which the ear-

lier adopter has left unoccupied for a long period—in this case more than forty years—and into which his trade would not naturally expand, the earlier adopter is estopped to assert trade-mark infringement in that territory."

The defendant corporation in the instant case was the first to use the name "Daughters of Isabella" in connection with and as a part of its corporate name in every state of the United States where used, except the state of Connecticut, and there was no intent or purpose on its part to take the benefit of the *reputation* of the unincorporated Connecticut voluntary association, or to *forestall* the extension of the business of that association. The defendant was the first to incorporate (June 24, 1903), and at that time the unincorporated association had made no effort to extend its activities or the use of the name, so far as it had used the name, outside the state of Connecticut. March 7, 1904, about nine months thereafter, it did incorporate as "Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus." That corporation still exists and retains that name. It was not until July 25, 1907, that the plaintiff here incorporated or came into existence. This was about four years after the incorporation of the defendant. During all that four years the defendant was active in extending its activities and membership into some 15 of the various states of the United States, viz. Pennsylvania, Georgia, Wisconsin, New York, Iowa, Kansas, New Jersey, South Carolina, Florida, Illinois, Mississippi, Virginia, Louisiana, Oklahoma, and Missouri. Since that time the incorporation of the plaintiff (July 25, 1907), and prior to the commencement of this action, the defendant has extended its activities and membership into the states of Nebraska, Indiana, Massachusetts, Wyoming, Rhode Island, Texas, Oregon, South Dakota, California, Ohio, Idaho, New Hampshire, North Dakota, Vermont, Minnesota, Washington, and Montana, and also into the District of Columbia, and has also been increasing the number of its courts and its membership in most or all of the other states named.

May 2, 1909, the defendant established its first court in Massachusetts, and January 21, 1912, or 1913, the plaintiff established its first circle in that state. November 12, 1911, the plaintiff established its first circle in the state of Illinois (Calumet Circle, No. 22, at Chicago, Ill.); but July 5, 1905, the defendant had entered that state and established a court at Chicago, No. 41; and February 10, 1907, another court at Chicago, No. 62; and April 26, 1908, another court, No. 84, at Rock Island, Ill.; and August 31, 1908, still another at Chicago, No. 89; and July 27, 1909, still another at Chicago, No. 112; and the same year, July 11, another at Blue Island, Ill.; and October 24, 1909, still another at Chicago, No. 120; and in 1910 two more in Chicago, Nos. 124 and 125. September 22, 1910, Catherine Keleher, Ann Keleher, Catherine Laske, Helen Boyer, and Agnes Wisla filed with the secretary of state of the state of Illinois articles of incorporation, stating, "The name of such corporation is Daughters of Isabella, Illinois Circle"; the object for which it is formed is:

"The object for which it is formed is to render pecuniary aid and assistance to sick and distressed members, and to the beneficiaries of members, whether such sickness be temporary or incurable; to render pecuniary aid

towards defraying the funeral expenses of members, the funds for paying all benefits to be raised by purely voluntary and charitable contributions; to promote social and intellectual intercourse among its members; and for literary purposes."

It was to be managed by a board of five directors.

October 3, 1911, a certificate of amendment to such last-named corporation was filed, which stated that it was signed by all the directors and members of said corporation, "Daughters of Isabella, Illinois Circle," and was signed by Agnes Wisla, Helen M. Boyer, Ann Keleher, Catherine Keleher, and Catherine Laske, showing a membership of five persons. This amendment enlarged the object and purposes of the corporation, granted power to locate and establish district, local, or subordinate circles "under the name Daughters of Isabella," in the state of Illinois "or elsewhere," to adopt by-laws, etc., to purchase and hold all kinds of property, and elect and appoint all proper officers. Neither the original nor the amended certificate of incorporation makes any reference to either the New York corporation or the Connecticut corporations.

February 26, 1912, Victoria Warnesson, Rhona Flynn, Belle V. Casey, Jule Warnesson, and Lilah McManus filed articles of incorporation in the office of the secretary of state of the state of Illinois under the name "Ladies of Isabella," the corporation to be governed by a board of five directors, and giving as its object:

"The object for which it is formed is for the purpose of promoting the social and intellectual standing of its members, who at all times must be members in good standing of the Roman Catholic Church; for literary purposes; for the purpose of rendering such aid and assistance among its members, their designated heirs and relatives, as shall be desirable and proper, and by such lawful means as shall be deemed best by them."

September 25, 1911, the five directors of the first-named Illinois corporation, "Daughters of Isabella, Illinois Circle," and who constituted its entire membership, resigned as directors thereof, and on the same day such members thereof, said Catherine Laske, Ann Keleher, Catherine Keleher, Agnes Wisla, and Helen M. Boyer, proceeded to elect Mary E. Booth, Mary E. Boland, Catherine J. Colwell, Agnes M. Finnigan, and Agnes J. Kay, all of New Haven, state of Connecticut, and all being members of said Connecticut corporation, "National Circle, Daughters of Isabella," directors of such Illinois corporation. Thereupon the meeting was adjourned. This is the only business this Illinois corporation ever did, unless it be that the following may be called doing business, viz.: After being elected directors of the Illinois corporation, and on the 2d day of November, 1911, said Agnes M. Finnigan, Anna E. Kay, Catherine J. Colwell, and Mary E. Booth, as "Board of Directors of the Daughters of Isabella, Illinois Circuit," petitioned the National Circle, Daughters of Isabella, and its board of directors, said Connecticut corporation, therein reciting the incorporation of the Illinois corporation, the election of Mary E. Booth as president and Catherine J. Colwell as secretary thereof, and that at a meeting of the directors thereof it had been voted, November 2, 1911, as follows:

"That the president be, and hereby is, appointed a committee of one to prepare, or cause to be prepared, a petition or application to the National Circle,

Daughters of Isabella, and to the board of direction thereof, setting forth the history of the incorporation and organization of the Daughters of Isabella, Illinois Circle, and the facts with reference to the present control of said corporation, and to request, in our name and by our authority, that a contract of affiliation be arranged between the National Circle, Daughters of Isabella, as organized under the laws of the state of Connecticut, and the Daughters of Isabella, Illinois Circle, as aforesaid, whereby said latter corporation may secure the right to use the ritual, passwords, and other secret work of the National Circle, Daughters of Isabella, to have representation in the National Circle, and whereby any lodges or circles organized under the charter of the Daughters of Isabella, Illinois Circle, may be governed and controlled, in so far as the same can be lawfully done, by the officers, and under the constitution, laws, rules, and regulations, of the said National Circle, Daughters of Isabella, so as, in effect, to make the two organizations one body, and, so far as practicable, under one management, and to still maintain the corporate existence of both organizations. And we hereby further direct our president and secretary to prepare, or cause to be prepared, such a contract, and, after the same has been duly approved by a vote of both parties thereto in such manner as may be necessary, to sign and execute the same in our behalf, and, subject to the supervision of this board, to carry the provisions thereof into full force and effect as soon as practicable."

And that a contract pursuant thereto had been prepared and was submitted for the consideration of the board, and which also recited and stated that "The National Circle, Daughters of Isabella," had never qualified to do business in the state of Illinois, and had no right to establish branches in said state, and "consequently has no right to establish branches in that state (Illinois), or to use the name Daughters of Isabella therein; and inasmuch as the said Illinois corporation now controls the exclusive right to the use of said name, and the right to establish branches or circles in said state of Illinois," and that as it might not be possible for said Connecticut corporation to secure the right to do business in some of the Western states without the payment of prohibitive fees, and "inasmuch as the charter granted by the state of Illinois can be filed in such states at nominal expense," etc., and "as furthermore the Illinois Circle now has an application for the institution of a large circle in the city of Chicago," etc., the petitioners asked earnest consideration of the petition, etc. This petition was executed at New Haven, Conn., November 2, 1911, by Agnes M. Finnigan, Anna E. Kay, Catherine J. Colwell, and Mary E. Booth, as "Board of Directors of the Daughters of Isabella, Illinois Circle."

Thereupon, on the same day, at New Haven, in the state of Connecticut, the said National Circle, Daughters of Isabella, passed a resolution to execute the proposed contract; and on the same day, November 2, 1911, at New Haven, Conn., the proposed contract was executed by signing "The National Circle, Daughters of Isabella, by Mary E. Booth. Daughters of Isabella, Illinois Circle, by Mary E. Booth. Attest: Margaret E. Stammers, Secretary The National Circle, Daughters of Isabella. Attest: Catherine J. Colwell, Secretary Daughters of Isabella, Illinois Circle." That contract so signed by the persons named, all residing in the state of Connecticut and all officers in the National Circle, Daughters of Isabella, this plaintiff, but elected in the manner aforesaid controlling officers of the said Illinois corporation, surrenders the control and management of the Illinois corporation to

the Connecticut corporation, this plaintiff, makes it subordinate thereto, and in effect purports to amalgamate it therewith. If of any force or effect whatever, it constitutes a surrender of its corporate rights and powers to the said Connecticut corporation and a consent to be governed and ruled by its constitution and by-laws. It does not, in terms or by implication, purport or attempt to transfer to the Connecticut corporations, or either of them, the right of the Illinois corporation to the name "Daughters of Isabella," or its right granted by the Illinois charter to use such name in the state of Illinois. Clearly the agreement had no such effect.

November 12, 1911, nine days thereafter, Calumet Circle, No. 22, was instituted at Chicago, Ill., according to the sworn list furnished by Josephine C. Curran, National Secretary of National Circle, Daughters of Isabella, this plaintiff. This was the first attempt of the plaintiff corporation to organize and do business in the state of Illinois.

At this time the defendant, as we have seen, had some nine courts duly organized and doing business in the city of Chicago and other points in the state of Illinois, the earliest of which was established in 1905. Clearly the defendant corporation was first to enter and do business in the state of Illinois and use the name "Daughters of Isabella" therein. It was not molested or interfered with in so doing from 1905 down to November, 1911, when plaintiff sought to establish its first circle in that state. I am unable to see that this plaintiff has gained any right or rights in ·the state of Illinois to use the name Daughters of Isabella as against the defendant corporation by or through the incorporation of the said "Daughters of Isabella, Illinois Circle," and the attempt to place it under the control of the plaintiff, the Connecticut corporation, and confer rights in the manner pointed out. The Illinois corporation is not a party to this suit. After the agreement between the said named persons residing in Connecticut who were officers of the plaintiff and who had caused themselves to be elected officers in the Illinois corporation, and themselves as officers of and·representing the said Illinois corporation, the plaintiff corporation attempted to organize and conduct circles in Illinois, but not as "Daughters of Isabella, Illinois Circle." The Connecticut corporation, this plaintiff, was not granted any right by the state of Illinois to do business in the state of Illinois. I do not think the agreement referred to conferred any right on the plaintiff against the defendant corporation. If the plaintiff had the right to enter . the state of Illinois and establish circles and do business there, such right was not superior to the right of defendant corporation long established in that state under the name National Order of the Daughters of Isabella. The state of Illinois has done nothing to exclude either party from the state or interfere with their using their corporate names in such state. After November 12, 1911, there was some conflict between certain of the members of the two organizations, this plaintiff and this defendant, in the city of Chicago, state of Illinois. It seems to me unnecessary to go into the details of those conflicts. The ladies concerned were and are most estimable ladies of the Catholic faith, and in

most matters seem to have acted in good faith in matters more or less involved in this most unfortunate litigation. The members of the courts established by the defendant claimed the right to use the name, and, under the leadership of the officers of the complainant corporation, the members of the circle established in 1911 claimed the exclusive right to the name in Illinois and elsewhere. The courts of Illinois were not invoked nor have they been at any time since.

It seems that the Connecticut corporation claims the sole and exclusive right to use the name "Daughters of Isabella" not only in Illinois, but everywhere, while the defendant, the New York corporation, by virtue of its prior incorporation and its first occupancy, etc., of all territory outside of Connecticut, and its first use of the name in all territory outside of Connecticut, claims the right to continue the use of that name everywhere outside of Connecticut. Except in Connecticut, the Legislature of no state has been appealed to nor have the laws of any state been invoked. When the defendant the "National Order of the Daughters of Isabella" entered the various states of the United States where it has gone, except Connecticut, the plaintiff corporation, "National Circle, Daughters of Isabella," had no circles, business, or business reputation in such states. It had made no attempt to enter such states and establish circles. This is true also of the first Connecticut corporation and of the unincorporated Connecticut voluntary association. There was no attempt by defendant to circumvent or injure the plaintiff. There was nothing to indicate that the plaintiff or the first Connecticut corporation was seeking or would seek to enter or use the name in those states or intended so to do. So far as appears, the defendant corporation or its incorporators were the first to think of a national body of Daughters of Isabella. It was not seeking or attempting to take the benefit of the reputation of the Connecticut voluntary association outside of Connecticut, for it had none, and it was not seeking to forestall the extension by it of the use of the name Daughters of Isabella in other states, for the Connecticut association was making no attempts or efforts to extend itself or its activities into other states.

The name Daughters of Isabella was not in general use by the Connecticut voluntary association, or by any one, until the defendant, in 1903, organized and incorporated and extended itself into the various states named. Clearly, it seems to me, in 1907, when the plaintiff was incorporated in Connecticut, the first Connecticut corporation, Daughters of Isabella, No. 1, Auxiliary to Russell Council, No. 65, Knights of Columbus, had no exclusive right to the use of the name Daughters of Isabella *outside the state of Connecticut* which it could confer, on or transmit to the plaintiff corporation when it came into being, especially as against this defendant.

It seems to me that the principles enumerated in Hanover Star Milling Co. v. Metcalf and Allen & Wheeler Co. v. Hanover Star Milling Co., 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713, and above cited and quoted, are controlling here. And it seems to me that it would work a gross injustice to now enjoin the defendant from using its

corporate name or from establishing courts under its corporate name anywhere outside of the state of Connecticut.

[2] I think the superior right to use the name Daughters of Isabella outside of Connecticut, as against the defendant, if it ever existed in the plaintiff, has been lost by nonuser, abandonment, and by laches. The plaintiff since its incorporation, except in Connecticut, has allowed the defendant corporation to go on with its work establishing courts in the numerous states named. The rights of thousands of members of the various orders of the defendant corporation are involved. Mere time is not of the essence of laches or acquiescence.

[3] The surrounding facts and circumstances are to be considered as well as the rights and interests of all concerned.

[4] Injunctions are granted to prevent, not to redress, injuries. During all these years the plaintiff corporation has known what the defendant corporation was doing outside the state of Connecticut and has made no legal protest. The decree of the superior court of the state of Connecticut prohibits this defendant from entering that state and there establishing courts. If that decree has been or should be violated by the defendant, a party to that action, such act or acts will constitute a contempt. After the decree of the said Superior Court of Connecticut and its affirmance, the defendant ceased to do business in that state. A corporation was then formed and incorporated in Connecticut under the name "Daughters of Castile." The courts of Connecticut have not interfered therewith or with its activities. That corporation has duly organized bodies in that state, and these of choice have become affiliated with the New York corporation, and use the name "Daughters of Castile," with the added words, "in full affiliation with the National Order, Daughters of Isabella."

I know of no law, and am not informed of any, which will prevent these members of the "Daughters of Castile" from affiliating with the New York corporation. If the National Order, Daughters of Isabella, this defendant, is promoting, aiding, and abetting the Daughters of Castile to use the name Daughters of Isabella in the manner stated, and thereby is violating the injunction of the Connecticut court, it seems to me resort should be had to that court, which has ample power in the premises to enforce its own orders and decrees, but I do not see, on the evidence, that such decree is being violated. Those bodies, "Daughters of Castile," exist in and carry on their activities in the state of Connecticut and are within the reach and power of its courts. If the "Daughters of Castile" desire to affiliate with the National Order of the Daughters of Isabella, I know of no rules of law or equity that will or should prevent them from so doing. The evidence does not establish that this defendant has courts in Connecticut masquerading under the name "Daughters of Castile" in full affiliation with the "National Order of the Daughters of Isabella," and hence is using the name "Daughters of Isabella" in that state.

On the whole case, which is complex and voluminous, I am satisfied the plaintiff is not entitled to the relief prayed for, and the bill of complaint will be dismissed, with costs.

# A.

### COURTS OF THE NATIONAL ORDER OF THE DAUGHTERS OF ISABELLA.

| Court No. | | Instituted. | Membership. |
|---|---|---|---|
| 1. | Utica, N. Y. | April 25, 1903 | 374 |
| 2. | Meadville, Pa. | Dec., 1903 | 95 |
| 3. | Augusta, Ga. | Feb. 7, 1904 | 77 |
| 4. | Cuba, Wis. | July 10, 1904 | 69 |
| 5. | New York City. | Feb. 22, 1904 | 303 |
| 6. | Carroll, Iowa. | May 18, 1904 | 159 |
| 7. | New York City. | April 24, 1904 | 66 |
| 8. | Naugatuck, Conn. | April 10, 1904 | 49 |
| 9. | New York City. | May 22, 1904 | 78 |
| 10. | Savannah, Ga. | Sept. 4, 1904 | 170 |
| 11. | Wichita, Kan. | Nov. 7, 1904 | 36 |
| 12. | Freeland, Pa. | Nov. 13, 1904 | |
| 13. | No Court organized under this number. | | |
| 14. | Emmetsburg, Iowa | Nov. 6, 1904 | 46 |
| 15. | New York City. | Nov. 20, 1904 | 160 |
| 16. | Gloversville, N. Y. | Nov. 20, 1904 | 87 |
| 17. | New York City. | Nov. 27, 1904 | 70 |
| 18. | Jersey City, N. J. | Nov. 28, 1904 | 155 |
| 19. | Charleston, S. C. | Nov. 20, 1904 | 68 |
| 20. | Jersey City, N. J. | Dec. 4, 1904 | 295 |
| 21. | Atlanta, Ga. | Jan. 8, 1905 | |
| 22. | Brooklyn, N. Y. | Jan. 29, 1905 | |
| 23. | St. Augustine, Fla. | Feb. 5, 1905 | 91 |
| 24. | Ansonia, Conn. | Feb. 12, 1905 | 75 |
| 25. | New York City. | Feb. 12, 1905 | 156 |
| 26. | Pottsville, Pa. | March 6, 1905 | 58 |
| 27. | New Britain, Conn. | March 12, 1905 | 93 |
| 28. | Waterbury, Conn. | March 14, 1905 | |
| 29. | New York City. | March 26, 1905 | 140 |
| 30. | Hoosick Falls, N. Y. | April 30, 1905 | 174 |
| 31. | De Witt, Iowa. | April 16, 1905 | |
| 32. | New York City. | April 27, 1905 | 255 |
| 33. | Winstead, Conn. | May 5, 1905 | |
| 34. | New York City. | April 26, 1905 | 150 |
| 35. | Corry, Pa. | May 7, 1905, | 75 |
| 36. | New York City. | June 11, 1905 | 72 |
| 37. | Derby, Conn. | May 21, 1905 | 50 |
| 38. | Brooklyn, N. Y. | Sept. 10, 1905 | 187 |
| 39. | Jamaica, N. Y. | June 4, 1905 | 59 |
| 40. | New Haven, Conn. | June 4, 1905 | 151 |
| 41. | Chicago, Ill. | July 5, 1905 | 45 |
| 42. | Johnstown | July 9, 1905 | 45 |
| 43. | Ottumwa, Iowa. | Oct. 15, 1905 | 59 |
| 44. | Greenwich, Conn. | Oct. 19, 1905 | 137 |
| 45. | New York City. | Dec. 17, 1905 | 335 |
| 46. | Brooklyn, N. Y. | Dec. 7, 1905 | 177 |
| 47. | Meridian, Miss. | Feb. 11, 1906 | |
| 48. | Hartford, Conn. | Jan. 7, 1906 | |
| 49. | Waterloo, Iowa | Feb. 3, 1906 | 155 |
| 50. | Trenton, N. J. | Feb. 28, 1906 | 108 |
| 51. | Bridgeport, Conn. | March 4, 1906 | 77 |
| 52. | Jacksonville, Fla. | May 6, 1906 | 103 |
| 53. | Ellinwood, Kan. | May 6, 1906 | |
| 54. | Alexandria, Va. | June 10, 1906 | 39 |
| 55. | Shamokin, Pa. | June 24, 1906 | 124 |
| 56. | Macon, Ga. | July 8, 1906 | 44 |

| Court No. | | Instituted. | Membership. |
|---|---|---|---|
| 57. | Brooklyn, N. Y. | July 8, 1906 | 64 |
| 58. | Elizabeth, N. J. | Sept. 3, 1906 | 188 |
| 59. | West Hoboken, N. J. | Nov., 1906 | 133 |
| 60. | Baton Rouge, La. | Jan. 28, 1907 | 71 |
| 61. | Belleville, N. J. | Dec. 2, 1906 | 110 |
| 62. | Chicago, Ill. | Feb. 10, 1907 | |
| 63. | Meriden, Conn. | Jan. 20, 1907 | |
| 64. | Enid, Okl. | April 27, 1907 | |
| 65. | Ossining, N. Y. | March 13, 1907 | 122 |
| 66. | Kane, Pa. | April 7, 1907 | 84 |
| 67. | Harrison, N. J. | April 12, 1907 | 48 |
| 68. | Brooklyn, N. Y. | April 28, 1907 | 35 |
| 69. | Poughkeepsie, N. Y. | May 12, 1907 | 215 |
| 70. | Nevada, Mo. | May 26, 1907 | |
| 71. | Mechanicsville, N. Y. | May 26, 1907 | 94 |
| 72. | Newark, N. J. | June 2, 1907 | 106 |
| 73. | Leavenworth, Kan. | June 17, 1907 | 69 |
| 74. | Warren, Pa. | July 7, 1907 | |
| 75. | Long Island City, N. Y. | Nov. 13, 1907 | 82 |
| 76. | Hoboken, N. J. | Sept. 22, 1907 | 94 |
| 77. | McCook, Neb. | Nov. 26, 1907 | |
| 78. | Pensacola, Fla. | Nov. 26, 1907 | 66 |
| 79. | Brooklyn, N. Y. | Nov. 3, 1907 | 134 |
| 80. | Brooklyn, N. Y. | Feb. 8, 1908 | 56 |
| 81. | Oklahoma City, Okl. | March 29, 1908 | 86 |
| 82. | Stamford, Conn. | May 3, 1908 | 70 |
| 83. | Loogootee, Ind. | April 26, 1908 | 46 |
| 84. | Rock Island, Ill. | April 26, 1908 | 48 |
| 85. | Richmond Hill, N. Y. | May 3, 1908 | 44 |
| 86. | Hempstead, N. Y. | May 31, 1908 | 49 |
| 87. | New Brighton, N. Y. | June 21, 1908 | 183 |
| 88. | Kansas City, Kan. | July 12, 1908 | 101 |
| 89. | Chicago, Ill. | Aug. 31, 1908 | 83 |
| 90. | Alliance, Neb. | Sept. 21, 1908 | 57 |
| 91. | New Rochelle, N. Y. | Oct. 18, 1908 | 32 |
| 92. | Jamestown, N. Y. | Nov. 6, 1908 | 156 |
| 93. | Yonkers, N. Y. | Oct. 25, 1908 | 92 |
| 94. | Iowa City, Iowa | Nov. 27, 1908 | 116 |
| 95. | St. Marys, Pa. | Nov. 26, 1908 | 145 |
| 96. | Falls City, Neb. | Nov. 26, 1908 | 80 |
| 97. | New York City | Jan. 24, 1909 | 93 |
| 98. | New York City | Sept. 19, 1909 | 57 |
| 99. | Troy, N. Y. | Feb. 7, 1909 | 123 |
| 100. | Chateaugay, N. Y. | April 18, 1909 | 98 |
| 101. | Mt. Vernon, N. Y. | April 4, 1909 | 62 |
| 102. | North Troy, N. Y. | March 25, 1909 | 141 |
| 103. | Stoneham, Mass. | May 2, 1909 | 68 |
| 104. | Sheridan, Wyo. | April 18, 1909 | 29 |
| 105. | Norwalk, Conn. | April 4, 1909 | 115 |
| 106. | South Norwalk, Conn. | May 9, 1909 | 88 |
| 107. | Cohoes, N. Y. | May 9, 1909 | 48 |
| 108. | Tarrytown, N. Y. | July 11, 1909 | 52 |
| 109. | Rockaway, N. Y. | June 27, 1909 | |
| 110. | Newport, R. I. | June 3, 1909 | 125 |
| 111. | Renovo, Pa. | June 20, 1909 | 49 |
| 112. | Chicago, Ill. | June 27, 1909 | |
| 113. | Blue Island, Ill. | July 11, 1909 | 108 |
| 114. | Port Jervis, N. Y. | July 18, 1909 | 174 |
| 115. | Austin, Tex. | Nov. 28, 1909 | 106 |
| 116. | Shawnee, Okl. | Sept. 19, 1909 | 64 |
| 117. | Covington, La. | Sept. 26, 1909 | 25 |
| 118. | Eugene, Or. | Oct. 3, 1909 | 38 |

| Court No. | | Instituted. | Membership. |
|---|---|---|---|
| 119. | Opelousas, La. | Oct. 24, 1909 | 37 |
| 120. | Chicago, Ill. | Oct. 24, 1909 | 58 |
| 121. | Stapleton, N. Y. | Dec. 5, 1909 | 87 |
| 122. | Malone, N. Y. | Nov. 21, 1909 | 83 |
| 123. | Middletown. Conn. | Jan. 9, 1910 | |
| 124. | Chicago, Ill. | March 6, 1910 | 25 |
| 125. | Chicago, Ill. | May 1, 1910 | 52 |
| 126. | Huron, S. D. | June 26, 1910 | 65 |
| 127. | Corona, N. Y. | June 19, 1910 | 81 |
| 128. | Schenectady, N. Y. | June 26, 1910 | 99 |
| 129. | Philadelphia, Pa. | July 31, 1910 | 147 |
| 130. | Hays, Kan. | Feb. 12, 1911 | 38 |
| 131. | Whitestone, N. Y. | Nov. 27, 1910 | 58 |
| 132. | Philadelphia, Pa. | Dec. 18, 1910 | |
| 133. | San Francisco, Cal. | April 30, 1911 | 245 |
| 134. | Hartford, Wis. | Feb. 26, 1911 | 55 |
| 135. | Chicago, Ill. | March 19, 1911 | 312 |
| 136. | Chicago Heights, Ill. | March 26, 1911 | 90 |
| 137. | Elmira, N. Y. | April 23, 1911 | 167 |
| 138. | Cambridge, Mass. | April 23, 1911 | 143 |
| 139. | Corning, N. Y. | May 7, 1911 | 114 |
| 140. | Milford, Conn. | April 23, 1911 | 71 |
| 141. | Arlington, Mass. | April 30, 1911 | 152 |
| 142. | Janesville, Wis. | April 30, 1911 | 72 |
| 143. | Chicago, Ill. | June 11, 1911 | 107 |
| 144. | Chicago, Ill. | May 7, 1911 | 62 |
| 145. | Chicago, Ill. | June 4, 1911 | |
| 146. | Rensselaer, N. Y. | May 14, 1911 | 97 |
| 147. | Chicago, Ill. | May 28, 1911 | 227 |
| 148. | Springfield, Ill. | June 11, 1911 | 168 |
| 149. | Piqua. Ohio | July 16, 1911 | 33 |
| 150. | Winchester, Mass. | July 2, 1911 | 126 |
| 151. | Astoria, Or. | Oct. 15, 1911 | 55 |
| 152. | Mason City, Iowa | Sept. 3, 1911 | 98 |
| 153. | Chicago, Ill. | Sept. 10, 1911 | |
| 154. | New Orleans, La. | Nov. 19, 1911 | 122 |
| 155. | Philadelphia, Pa. | Dec. 3, 1911 | 49 |
| 156. | Woburn, Mass. | Nov. 19, 1911 | 100 |
| 157. | Eagle Grove, Iowa | Dec. 11, 1911 | 82 |
| 158. | Lewiston, Idaho | Feb. 4, 1912 | 37 |
| 159. | Oakland, Cal. | Feb. 4, 1912 | 131 |
| 160. | Chicago, Ill. | Feb. 18, 1912 | 98 |
| 161. | Flushing, N. Y. | Feb. 18, 1912 | 95 |
| 162. | Brockton, Mass. | Jan. 28, 1912 | 307 |
| 163. | Woonsocket, S. D. | Feb. 18, 1912 | 58 |
| 164. | Kingston, N. Y. | Feb. 25, 1912 | 151 |
| 165. | Rockland, Mass. | Feb. 11, 1912 | 62 |
| 166. | Newton, Mass. | Feb. 18, 1912 | 199 |
| 167. | Concord, N. H. | April 14, 1912 | 97 |
| 168. | Franklin, La. | March 17, 1912 | 50 |
| 169. | Lincoln, Ill. | April 14, 1912 | 70 |
| 170. | Minot, N. D. | March 7, 1912 | 131 |
| 171. | Lexington, Mass. | April 21, 1912 | 70 |
| 172. | Sacramento, Cal. | May 5, 1912 | 78 |
| 173. | Fair Haven, Vt. | June 23, 1912 | 71 |
| 174. | Bedford, Ind. | April 28, 1912 | 35 |
| 175. | Shenandoah, Pa. | April 28, 1912 | 88 |
| 176. | Malden, Mass. | May 12, 1912 | 148 |
| 177. | Houma, La. | June 23, 1912 | 35 |
| 178. | Jeanerette, La. | July 7, 1912 | 36 |
| 179. | Le Mars, Iowa | July 28, 1912 | 125 |
| 180. | St. Joseph, Mo. | Oct. 6, 1912 | 56 |

| Court No. | | Instituted. | Membership. |
|---|---|---|---|
| 181. | Santa Rosa, Cal | Oct. 6, 1912 | 96 |
| 182. | Beaumont, Tex | Oct. 13, 1912 | 69 |
| 183. | No. Cambridge, Mass | Nov. 10, 1912 | 225 |
| 184. | Marshall, Tex | Jan 5, 1913 | 31 |
| 185. | Brewster, N. Y | Dec. 1, 1912 | 82 |
| 186. | Jersey City Heights, N. J | Dec. 15, 1912 | 73 |
| 187. | Somerville, Mass | Dec. 8, 1912 | 196 |
| 188. | Glens Falls, N. Y | Dec. 8, 1912 | 141 |
| 189. | Sheldon, Iowa | Jan. 25, 1913 | 72 |
| 190. | Rock Rapids, Iowa | Feb. 1, 1913 | 119 |
| 191. | Winona, Minn | Feb. 2, 1913 | 68 |
| 192. | Haywards, Cal | Feb. 2, 1913 | 38 |
| 193. | Ridgefield, Conn | Feb. 9, 1913 | 36 |
| 194. | Hornell, N. Y | Feb. 9, 1913 | 103 |
| 195. | Newburgh, N. Y | Feb. 23, 1913 | 160 |
| 196. | Spokane, Wash | March 1, 1913 | 281 |
| 197. | Shreveport, La | March 30, 1913 | 37 |
| 198. | Du Bois, Pa | March 28, 1913 | 116 |
| 199. | West New York, N. J | March 30, 1913 | 64 |
| 200. | Poultney, Vt | May 18, 1913 | 46 |
| 201. | Highland Falls, N. Y | May 11, 1913 | 107 |
| 202. | Bayonne, N. J | May 11, 1913 | 154 |
| 203. | Smethport, Pa | May 11, 1913 | 40 |
| 204. | Fowler, Ind | Sept. 21, 1913 | 62 |
| 205. | Chicago, Ill | May 25, 1913 | 121 |
| 206. | Yoakum, Tex | June 1, 1913 | 53 |
| 207. | Sanborn, Iowa | Sept. 6, 1913 | 47 |
| 208. | Eunice, La | Nov. 9, 1913 | 39 |
| 209. | Fort Worth, Tex | June 22, 1913 | 108 |
| 210. | Chanute, Kan | Sept. 28, 1913 | 51 |
| 211. | Bridgewater, Mass | June 22, 1913 | 51 |
| 212. | Washington, D. C | Oct. 19, 1913 | 191 |
| 213. | Whitman, Mass | Aug. 15, 1913 | 63 |
| 214. | San Antonio, Tex | Oct. 26, 1913 | 213 |
| 215. | Rock Valley, Iowa | Oct. 4, 1913 | 99 |
| 216. | Fort Dodge, Iowa | Oct. 26, 1913 | 104 |
| 217. | Oneonta, N. Y | Nov. 16, 1913 | 66 |
| 218. | West Chester, Pa | Nov. 23, 1913 | 44 |
| 219. | Sayre, Pa | Nov. 16, 1913 | 96 |
| 220. | San Mateo, Cal | Dec. 14, 1913 | 52 |
| 221. | McKeesport, Pa | Dec. 14, 1913 | 173 |
| 222. | La Grange, Ill | | |
| 223. | Waltham, Mass | Dec. 14, 1913 | 113 |
| 224. | Rochester, Minn | Jan. 25, 1914 | 62 |
| 225. | Ashland, Pa | Dec. 21, 1913 | 83 |
| 226. | Chicago, Ill | Feb. 1, 1914 | 68 |
| 227. | Chicago, Ill | Feb. 15, 1914 | 71 |
| 228. | Galveston, Tex | Feb. 15, 1914 | 69 |
| 229. | Chicago, Ill | Feb. 22, 1914 | 121 |
| 230. | Latrobe, Pa | Feb. 22, 1914 | 78 |
| 231. | New Castele, Pa | March 8, 1914 | 58 |
| 232. | Middleboro, Mass | March 22, 1914 | 55 |
| 233. | Lemont, Ill | April 5, 1914 | 25 |
| 234. | Houston, Tex | April 19, 1914 | 97 |
| 235. | Waverly, N. Y | April 19, 1914 | 67 |
| 236. | Ottawa, Ill | May 3, 1914 | 198 |
| 237. | Binghamton, N. Y | May 3, 1914 | 156 |
| 238. | Rutherford, N. J | May 3, 1914 | 59 |
| 239. | Glendive, Mont | May 24, 1914 | 47 |
| 240. | Ithaca, N. Y | May 16, 1914 | 99 |
| 241. | Peekskill, N. Y | May 24, 1914 | 61 |
| 242. | Oil City, Pa | May 24, 1914 | 111 |

| Court No. | | Instituted. | Membership. |
|---|---|---|---|
| 243. | Bellingham, Wash. | June 21, 1914 | 68 |
| 244. | Braddock, Pa. | July 19, 1914 | 96 |
| 245. | Salem, Or. | July 12, 1914 | 64 |
| 246. | Corpus Christi, Tex. | Aug. 23, 1914 | 56 |
| 247. | Adrian, Minn. | Dec. 6, 1914 | 111 |
| 248. | Hudson, N. Y. | Nov. 22, 1914 | 107 |
| 249. | Muenster, Tex. | Dec. 6, 1914 | 27 |
| 250. | Dunkirk, N. Y. | Dec. 6, 1914 | 47 |
| 251. | Chicago, Ill. | Dec. 20, 1914 | 84 |
| 252. | Stuart, Iowa | Jan. 31, 1915 | 45 |
| 253. | Pittsburgh, Pa. | Feb. 7, 1915 | 95 |
| 254. | Baltimore, Md. | Feb. 7, 1915 | 99 |
| 255. | Wenatchee, Wash. | Feb. 21, 1915 | 45 |
| 256. | Lake Placid, N. Y. | May 9, 1915 | 38 |
| 257. | Scotland, Tex. | April 1, 1915 | 34 |
| 258. | Englewood, N. J. | April 25, 1915 | 49 |
| 259. | Bennington, Vt. | May 16, 1915 | 65 |
| 260. | Connellsville, Pa. | April 25, 1915 | 47 |
| 261. | Fargo, N. D. | April 25, 1915 | 54 |
| 262. | Miami, Fla. | May 10, 1915 | 67 |
| 263. | Auburn, N. Y. | May 16, 1915 | 75 |
| 264. | Cornwall, N. Y. | June 20, 1915 | 27 |
| 265. | Ilion, N. Y. | June 27, 1915 | 58 |
| 266. | Earling, Iowa | Dec. 5, 1915 | 41 |
| 267. | Albany, Or. | Nov. 14, 1915 | 26 |
| 268. | Devils Lake, N. D. | Dec. 15, 1915 | 68 |
| 269. | Sioux City, Iowa | March 5, 1915 | 33 |
| 270. | Portland, Or. | Feb. 13, 1916 | 40 |
| 271. | Sioux Falls, S. D. | Jan. 23, 1916 | 49 |
| 272. | Coon Rapids, Iowa | | |
| 273. | Hagerstown, Md. | March 5, 1916 | 50 |
| 274. | Nogales, Ariz. | | |
| 275. | Perth Amboy, N. J. | March 12, 1916 | 75 |
| 276. | La Salle, Ill. | March 5, 1916 | 42 |
| 277. | Catskill, N. Y. | | |
| 278. | Frederick, Md. | June 11, 1916 | 37 |
| 279. | So. Boston, Mass. | June 18, 1916 | 43 |
| 280. | Parkston, S. D. | June 11, 1916 | 49 |
| 281. | San Jose, Cal. | Aug. 6, 1916 | 30 |
| 282. | Otterbeim, Ind. | | |
| 283. | Algona, Iowa | Aug. 13, 1916 | 29 |
| 284. | Britt, Iowa | Aug. 27, 1916 | 35 |

## ADDITIONAL LIST OF COURTS OF THE N. O. D. OF I.

| Court | No. | Location. | Instituted. |
|---|---|---|---|
| Maryland | 278. | Frederick, Md. | June 11, 1916 |
| Marquette | 279. | So. Boston, Mass. | June 18, 1916 |
| Sacred Heart | 280. | Parkston, S. D. | June 11, 1916 |
| San Jose | 281. | San Jose, Cal. | Aug. 6, 1916 |
| Cecelia | 283. | Algona, Iowa | Aug. 13, 1916 |
| Catherine | 284. | Britt, Iowa | Aug. 27, 1916 |
| St. Peter | 285. | Cambridge, Mass. | Oct. 22, 1916 |
| Mt. Carmel, | 286. | Roxbury, Boston | Oct. 25, 1916 |
| Loretto | 287. | New Brunswick, N. J. | Oct. 29, 1916 |
| Stella Maris | 288. | Atlantic City, N. J. | Nov. 5, 1916 |
| Veronica | 289. | Granville, N. Y. | Nov. 26, 1916 |
| University | 290. | Chicago, Ill. | Dec. 17, 1916 |
| Watchung | 291. | Plainfield, N. J. | Nov. 3, 1916 |
| Isabella | 292. | Morris, Ill. | Dec. 10, 1916 |
| Santa Barbara | 293. | Santa Barbara, Cal. | Dec. 10, 1916 |

| Court | No. | Location. | Instituted. |
|---|---|---|---|
| Immaculate Conception | 294. | Roxbury, Boston | Jan. 10, 1917 |
| Santa Maria | 295. | Medina, N. Y. | Jan. 21, 1917 |
| | 296. | Windthorst, Tex. Charter granted | Dec. 27, 1916 |
| Columbia | 297. | Paterson, N. J. | Jan. 7, 1917 |
| Gaffney | 298. | Rutland, Vt. | Jan. 28, 1917 |
| Carroll | 299. | Wheeling, W. Va. | Feb. 4, 1917 |
| | 300. | Dunlap, Iowa | Feb. 18, 1917 |
| | 301. | Somerville, N. J. Charter granted | Feb. 7, 1917 |
| | 302. | Des Moines, Iowa | Feb. 18, 1917 |
| | 274. | Nogales, Ariz. Charter granted. | Feb. 11, 1916 |
| | | First meeting to organize held | Jan. 4, 1917 |

## B.

### NATIONAL CIRCLES, DAUGHTERS OF ISABELLA.

| Circle. | No. | Location. | Instituted. | Membership. |
|---|---|---|---|---|
| Russell | 1. | New Haven, Conn. | May 14, 1897 | 399 |
| San Salvadore | 4. | New Haven, Conn. | Oct. 22, 1905 | 125 |
| Isabella | 12. | New Britain, Conn. | March, 1911 | 110 |
| Silver City | 16. | Meriden, Conn. | June, 1911 | 92 |
| Pinta | 18. | Wallingford, Conn. | Oct. 15, 1915 | 95 |
| Kennedy | 20. | Naugatuck, Conn. | Oct., 1911 | 96 |
| Regina | 21. | Springfield, Mass. | Jan. 21, 1912 | 255 |
| Calumet | 22. | Chicago, Ill. | Nov. 12, 1911 | 285 |
| Columbia | 26. | Holyoke, Mass. | April 21, 1912 | 73 |
| Santa Maria | 27. | Waterbury, Conn. | May 19, 1912 | 123 |
| Riverside | 28. | Riverside, R. I. | July, 1912 | 33 |
| Auburn | 29. | Chicago, Ill. | March 16, 1913 | 168 |
| Hyde Park | 31. | Chicago, Ill. | April 25, 1913 | 101 |
| Pawtucket | 32. | Pawtucket, R. I. | May 18, 1913 | 129 |
| Santa Maria | 34. | Worcester, Mass. | May 23, 1913 | 197 |
| Santa Maria | 35. | Chicago, Ill. | June 1, 1913 | 292 |
| La Rabida | 36. | Chicago, Ill. | June 8, 1916 | 164 |
| Alten | 37. | Alten, Ill. | Feb., 1914 | 124 |
| St. Patrick | 38. | Chicago, Ill. | May 16, 1914 | 85 |
| San Salvadore | 39. | Chicago, Ill. | Aug. 28, 1914 | 247 |
| Danville | 40. | Danville, Ill. | Sept. 24, 1914 | 69 |
| Valley Falls | 41. | Valley Falls | Dec. 13, 1914 | 84 |
| Alhambra | 42. | Ashten, R. I. | Jan., 1915 | 93 |
| Patricia | 43. | Lement, Ill. | Jan. 3, 1915 | 20 |
| Jeanne d'Arc | 44. | Fitchburg, Mass. | Jan. 17, 1915 | 205 |
| St. Rita | 45. | Woonsocket, R. I. | March 28, 1915 | 154 |
| Gen. Sherman | 46. | Chicago, Ill. | March 22, 1915 | 119 |
| Isabella | 47. | Chicago, Ill. | March 28, 1915 | 84 |
| Odell | 48. | Odell, Ill. | April 11, 1915 | 87 |
| Collinsville | 49. | Collinsville, Ill. | June 6, 1915 | 65 |
| Racine | 50. | Racine, Wis. | May 9, 1915 | 80 |
| Providence | 51. | Providence, R. I. | June 6, 1915 | 118 |
| Fort Dearborn | 52. | Chicago, Ill. | June 27, 1915 | 104 |
| Bloomington | 53. | Bloomington, Ill. | July 11, 1915 | 170 |
| Marquette | 54. | Kansas City, Mo. | Sept. 19, 1915 | 92 |
| Burlington | 55. | Burlington, Wis. | Sept. 19, 1915 | 24 |
| Mother Theodore | 56. | Indianapolis, Ind. | Sept. 26, 1915 | 396 |
| Genoa | 57. | Webster, Mass. | Oct. 3, 1915 | 38 |
| Santa Maria | 58. | Providence, R. I. | Dec. 12, 1915 | 30 |
| Twin City | 59. | East Chicago, Ind. | March 19, 1916 | 40 |

| Circle. | No. | Location. | Instituted. | Member-ship. |
|---|---|---|---|---|
| Benedict | 61. | No. Attelboro, Mass. | April 6, 1916 | 81 |
| Jeanne d'Arc | 60. | Terre Haute, Ind. | April 30, 1916 | 54 |
| Washington | 62. | Maywood, Ill. | April 16, 1916 | 34 |
| St. Rita | 63. | Connersville, Ind. To be instituted May 14, 1916 | | |
| St. Brendan | 64. | Chicago, Ill. | May 6, 1916 | 50 |

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes